Adolf **KUTCHERA**, Plaintiff and Appellant,

v.

Anna **KUTCHERA** et al., Defendants and Respondents,

and

William G. Lengenfelder, Defendant and Appellant.

Civ. No. 8669.

Supreme Court of North Dakota.

Aug. 31, 1971.

Zuger, Bucklin & Zuger, Bismarck, for plaintiff and appellant Adolf Kutchera and for defendant and appellant William G. Lengenfelder.

Pearce, Engebretson, Anderson & Schmidt, Bismarck, for defendant and respondent Anna Kutchera.

Conmy, Conmy, Rosenberg & Lucas, Bismarck, for defendant and respondent Joseph L. Carey.

Rausch & Chapman, Bismarck, for defendant and respondent Modern Machine Works.

STRUTZ, Chief Justice.

The plaintiff, with two others as partners, started a business in 1911 in the city of Bismarck for the building and manufacture of machines, mechanical tools and devices, and related products. During the ensuing years, the plaintiff acquired the interests of his two partners and became the sole owner of the enterprise. In 1937, the business was incorporated, with the plaintiff retaining a majority interest.

After the corporation had been formed, the plaintiff left the State of North Dakota for the West Coast, leaving the actual conduct of the business to the minority stockholders. Although he never returned to this State to live, he did retain his majority interest in the firm. The defendant Carey, as bookkeeper of the corporation, made one or two written reports to the plaintiff every month on the affairs of the business and, in addition, the plaintiff made trips to Bismarck twice each year during which

trips he would visit the corporation's place of business and check on its affairs.

By the year 1960, the books of the corporation disclosed that the 2,000 shares of stock were held by the following individuals:

—The plaintiff held 1,013 shares;

—The plaintiff's wife held 7 shares;

—Anton J. Kutchera held 400 shares;

—William G. Lengenfelder held 400 shares; and

—Joseph L. Carey held 180 shares.

The record also discloses that this was a closed corporation. Anton J. Kutchera was the plaintiff's brother; the defendant Lengenfelder is his stepson; and the defendant Carey was a long-time trusted employee who had served as bookkeeper of the business for many years. The minority stockholders all received their stock by having it paid for out of the earnings of the corporation.

On February 24, 1960, the plaintiff returned to Bismarck to attend the annual meeting of the corporation. At that meeting, with all of the stockholders present except the plaintiff's wife, the plaintiff moved that the following contract be inserted into the minutes:

"It is hereby understood and agreed between the undersigned parties consisting of Adolf Kutchera, A. J. Kutchera, W. G. Lengenfelder and J. L. Carey that in the event that one of the stockholders *desires* to sell his capital stock of the Modern Machine Works, Bismarck, North Dakota, he must first offer it for sale to the Modern Machine Works, a Corporation, at $100.00 per share. Modern Machine Works would then purchase this stock as treasury stock. The remaining STOCKHOLDERS of the Corporation would then have first option to purchase the capital stock from the corporation before it can be offered for sale on the open market. Such an option is not an absolute right to purchase the stock, but can be exercised only in the event that one STOCKHOLDER *desires* to sell.

"It is further agreed between the undersigned, that in the event of the death of any STOCKHOLDER of the Modern Machine Corporation, the surviving STOCKHOLDERS agree to purchase the capital stock from the deceased's ESTATE and the deceased STOCKHOLDER hereby binds his ESTATE to sell the stock. This contract will hereby be binding upon all of the STOCKHOLDERS.

"Adolf Kutchera's capital stock in the Modern Machine Works is to be distributed in accordance with the provisions of his *LAST WILL and TESTAMENT*.

"It is further understood and agreed that a fair market price for the sale to the Corporation or to the other STOCKHOLDERS is the par value or $100.00 per share." [Italicizing is as it appears in the minutes.]

By entering into this contract, the stockholders, with the exception of the plaintiff himself, bound themselves, in the event they wanted to sell their stock in the company, to first offer it to the corporation, which then would purchase it as treasury stock for $100 a share. In the event of the death of one of the stockholders, the estate of such stockholder was bound by this agreement to sell his stock according to its terms. However, the plaintiff's stock was to be distributed according to the provisions of his last will and testament.

Although the agreement provided that plaintiff's stock was to be distributed according to the provisions of his last will and testament, on March 1, 1966, the plaintiff offered to sell his stock to the corporation for $100 per share, the offering price stated in the agreement for the stock of the other stockholders. The offer was accepted, and the purchase price was paid by the corporation, partly in cash and by giving notes of the corporation for the balance.

These notes thereafter were paid out of earnings of the corporation, and they had been fully satisfied more than one year prior to the commencement of this action by the plaintiff.

On May 25, 1966, less than three months after the plaintiff had sold all his stock to the corporation, Anton Kutchera died, leaving his 400 shares of stock to his widow. Arthur Kutchera, Anton's son, was appointed administrator with the will annexed of his estate. On October 8, 1966, about seven months after the plaintiff had sold his stock to the corporation, a meeting of the stockholders was held and attended by the defendant Lengenfelder, the defendant Carey, and Arthur Kutchera, who, as administrator of his father's estate, represented his mother at the meeting. All stockholders as of that time and all officers of the corporation were represented at the meeting. A resolution in the form of a motion was offered to cancel the contract which had been entered into on February 24, 1960. The motion was in the following language:

"It was moved by Joseph L. Carey and seconded by William G. Lengenfelder that the contract appearing in the Corporation minutes of the stockholders' meeting held on February 24, 1960, relating to the purchase and sale of stock by stockholders or the estate of deceased stockholders, be cancelled, terminated and annulled, and that such cancellation be evidenced by the signing of the minutes showing this resolution by all of the stockholders."

This resolution cancelling the contract of February 24, 1960, was unanimously adopted and approved by the stockholders.

The two remaining stockholders of the original stockholders made no effort at this meeting to exercise the option which the contract of February 24, 1960, gave the corporation to acquire the stock of the deceased stockholder as treasury stock. Thereafter, subsequent to the unanimous cancellation of the February 24, 1960, agreement, the widow of Anton Kutchera, through her son, Arthur, administrator of his father's estate, offered to sell all of the Anton Kutchera stock for $550 per share. The defendant Joseph L. Carey also wanted to sell his stock to the corporation at that price.

The plaintiff learned of these developments some time later, and, in July of 1969, started this action to enforce the contract of February 24, 1960, or to rescind the sale of his stock to the corporation. The trial court held for the defendants, dismissing plaintiff's complaint, and the plaintiff appeals to this court, demanding trial de novo.

A number of questions are raised by this action, which can be considered as two main issues:

1. After the contract of February 24, 1960, had been entered into and after the plaintiff, although not bound by its provisions, had sold to the corporation all of his stock at a price less than its true value, pursuant to its terms, could the remaining stockholders legally terminate the agreement?

2. If such agreement was subject to cancellation by the remaining stockholders, is the plaintiff permitted to rescind the sale of his stock to the corporation or, in the alternative, may the court decree a constructive trust and find that such stock is held by the corporation under such trust on the ground that the corporation had acquired the plaintiff's stock through fraud and mistake?

The first issue to be considered is whether, after the plaintiff had transferred his stock to the corporation, he still had such an interest that he could bring this action to enforce the agreement of February 24, 1960. We believe that this issue must be determined against the plaintiff.

The contract, as originally drawn on February 24, 1960, lacked mutuality because the plaintiff himself was not bound

by its provisions. Thus it could not have been enforced against him. This court has held that both parties must be bound by a contract or neither is bound. Shellburg v. Wilton Bank, 39 N.D. 530, 167 N.W. 721 (1918). On March 1, 1966, the plaintiff, the party to the contract who was not bound, informed the remaining stockholders that he desired to sell all of his stock and the stock held by his wife to the corporation for $100 per share, as provided for in the agreement. Where the party not bound by a contract performs, the contract becomes binding upon the other party or parties. As stated in 17 C.J.S. Contracts § 100(3)a, at page 799, lack of mutuality may be cured by the party not bound by fully performing his part of the contract. The plaintiff fully performed under the contract and his stock was transferred to the corporation.

◾ Generally speaking, the owner of corporate stock has the absolute right to transfer his stock, except insofar as that right is restricted by the corporate charter or the articles of incorporation, by statute, by valid bylaw or resolution, or by agreement. 2 A.L.R.2d Restrictions on Sale of Corporate Stock, Sec. 2, at 748.

It has been held that even an invalid bylaw may operate as a binding agreement upon those who assent to it, if it is not contrary to public policy. Oakland Scavenger Co. v. Gandi, 51 Cal.App.2d 69, 124 P.2d 143 (1942). However, stockholders' agreements restricting sale of corporate stock to remaining stockholders before selling to strangers will be construed so as to give the widest range of choice permissible under the language used in the agreement. Guaranty Laundry Co. v. Pulliam, 198 Okla. 667, 181 P.2d 1007, 2 A.L.R.2d 738 (1947).

The validity of the agreement to restrict the sale of corporate stock in the instant case, however, is not being raised by one who has a financial interest in the corporation. The plaintiff is a former stockholder who, prior to the bringing of this action, had transferred all of his stock to the company and had received the full purchase price he had requested for it.

◾ As a general rule, a valid transfer of shares of stock, when completed, confers upon the transferee—in this case, the corporation—all of the rights and privileges of the transferor—in this case, the plaintiff. The plaintiff, as transferor, ceased to be a stockholder on the transfer of his stock and he had no further rights or voice in the affairs of the corporation. Fletcher, Cyclopedia of Corporations, Perm.Ed., Vol. 12, Sec. 5463, p. 333.

A stockholder remains such until he transfers his shares to another, or until his status is terminated by the forfeiture of his stock. 18 Am.Jur.2d Corporations, Sec. 472, p. 968.

◾ Thus, after the plaintiff had voluntarily transferred his stock to the corporation and had been paid for it, he was divested of every right and power as a stockholder. After the transfer of the stock had been completed, he ceased to have any further rights which he could enforce by this action. The contract which the parties had made on February 24, 1960, thereafter could be altered or entirely cancelled by the remaining stockholders and officers of the corporation. A former stockholder may not be permitted to exercise any authority after he has ceased to have any interest in the corporation. Therefore, the plaintiff's attempt to enforce the contract of February 24, 1960, must fail.

The next issue for us to determine on this appeal is whether, since the resolution of February 24, 1960, could legally be cancelled and terminated by the stockholders and officers of the corporation at any time, the plaintiff may maintain an action to rescind the sale of his stock to the corporation, which sale, he asserts, was made by him under the belief on his part that the agreement of February 24, 1960, could be enforced by him.

Section 10–18–07, North Dakota Century Code, provides for rescission of a transfer of corporate stock where such transfer was procured by fraud or duress or where it—

" * * * was made under such mistake as to make the endorsement or delivery inequitable; * * * "

Was the transfer of the plaintiff's stock procured by fraud or duress, or was it made under such mistake as to make the endorsement or delivery of it to the corporation inequitable?

The record is absolutely devoid of any evidence of fraud or duress. The transfer of the stock and the terms of such transfer were the plaintiff's own idea. No one urged him to make such conveyance and, since the plaintiff himself was exempt under the terms of the resolution which had been adopted from transferring his property, he was under no compulsion to sell his stock to the corporation or to sell it for $100 per share, which admittedly is less than its true value. The plaintiff admits that he was aware that the true value of the stock was more than he was asking for it. He also admits that he was aware of the fact that, under the law, the resolution of February 24, 1960, could be cancelled at any time the stockholders saw fit to cancel it. He was asked:

"Was it your understanding, Mr. Kutchera, that at any time the stockholders could have changed the agreement?"

His reply was:

"Sure, sure. I think it could have been; we never remarked, though, about it. * * * "

■ Thus the plaintiff admits that what happened in this case when the stockholders voted to cancel the agreement of February 24, 1960, was something that could happen and something that was legal. With knowledge that the stockholders could legally change the terms of the transfer of the corporate stock and then, in spite of that knowledge, deliberately transferring his stock, the plaintiff cannot now claim that he was defrauded or forced into such transaction or that he made the transfer under such mistake as to make his endorsement or delivery of it to the corporation inequitable. The plaintiff's sole aim in transferring his stock was to keep control of the corporation in the hands of the original incorporators or the survivor of them, and he was willing to transfer his stock to the corporation in the hope that this might be accomplished, even though he knew that, should the remaining stockholders desire to do so, they could legally terminate the resolution at any time. Thus he admits that he knew the law and that his only mistake was in believing that the other incorporators would honor his wishes in the matter even though, under the law, they were not required to do so. He transferred his stock to the corporation freely and voluntarily and with full knowledge of what could happen, and he cannot now rescind the transfer because what he knew could happen did happen, even though contrary to his wishes and desires.

The final question presented by the plaintiff on this appeal is whether, even though rescission will not lie in this case, the court will decree that a constructive trust be imposed and find that the corporation holds the plaintiff's stock under such constructive trust.

■ A constructive trust is a creature of equity used as a remedial device by which the holder of legal title to property is held to be a trustee for the benefit of another, who in good conscience is entitled to some beneficial interest therein. 89 C.J.S. Trusts § 139a, p. 1015.

■ A constructive trust is a trust created by construction of law, as distinguished from a direct trust. It is a trust not created by words, express or implied, but by the construction of equity in order to satisfy the demands of justice. 89 C.J.S. Trusts § 15, p. 726.

■ Our court has held that a constructive trust will be imposed in order to do equity and prevent unjust enrichment, when title to property is acquired by fraud or undue influence or is acquired or retained in violation of a fiduciary duty. Rovenko v. Bokovoy, 77 N.D. 740, 45 N.W. 2d 492 (1950); McDonald v. Miller, 73 N.D. 474, 16 N.W.2d 270, 156 A.L.R. 1328 (1944).

■ This court also has held that a constructive trust will be raised in equity where property has been acquired under circumstances not amounting to fraud, but where it would be inequitable for the holder of legal title to retain such property. Arntson v. First National Bank of Sheldon, 39 N.D. 408, 167 N.W. 760, L.R.A. 1918F 1038.

■ To establish an implied or constructive trust, however, the evidence must be clear and convincing. Lander v. Hartson, 77 N.D. 923, 47 N.W.2d 211 (1951); Sprenger v. Sprenger, 146 N.W.2d 36 (N.D. 1966).

Thus a constructive trust is a device which courts of equity have created to do justice in certain cases, and which will be employed for that purpose. It is no trust at all, however, but equity merely will make use of trust machinery where the law fails to provide an adequate remedy to do justice.

Now let us consider the facts in this case and determine whether they present a situation in which the ends of justice require that the court make use of the machinery of trusts to do equity, by declaring a constructive trust to exist.

It is undisputed that the stock transferred to the corporation by the plaintiff had a value greater than $100 a share, the amount for which he offered to sell it and which was paid to him by the corporation. Just what the actual value of the stock was on the date of the plaintiff's transfer to the corporation is not disclosed by the record. But, conceding that the stock was sold for less than its actual value, how was the plaintiff injured? He voluntarily offered to sell it for $100 a share. That is the amount which he was paid for it. He did not lose one dime because of the failure of the stockholders to honor his wishes in regard to the transfer of the stock since he would not have received any more for his stock if his wishes as set forth in the resolution had been scrupulously followed. All that he would have received would have been the personal satisfaction of knowing that his idea of having the corporation end up as the sole property of one of the original stockholders—the one who would happen to outlive the others—would become a reality.

■ In order to establish an implied or constructive trust, the evidence must be clear and convincing that the defendant corporation would be unjustly enriched or that the stock was acquired by the corporation through fraud or duress, or that it is being held by the corporation in violation of a fiduciary duty. There is no evidence whatsoever in the record to establish that any of these circumstances exist.

We find, therefore, that the record does not show facts which require or which would permit the court to impose a constructive trust.

For reasons stated in this opinion, the judgment of the district court is in all things affirmed.

TEIGEN, PAULSON, KNUDSON and ERICKSTAD, JJ., concur.