Leland M. STENEHJEM and Judith Ste-
nehjem, Plaintiffs and Appellants,

v.

T. W. SETTE et al., Defendants
and Appellees.

Civ. No. 9136.

Supreme Court of North Dakota.

March 18, 1976.

Wheeler, Wolf, Wefald & Durick, Bismarck, and Leland M. Stenehjem, Jr., Washington, D. C., for plaintiffs and appellants; argued by R. W. Wheeler, Bismarck, and Leland M. Stenehjem, Jr., Washington, D. C.

Vogel, Vogel, Brantner & Kelly, Fargo, for defendants and appellees T. W. and Marie S. Sette; argued by Carlton J. Hunke, Fargo.

Pearce, Anderson, Pearce, Thames & Pearce, Bismarck, for defendant and appellee V. R. Uttke; argued by William R. Pearce, Bismarck.

VOGEL, Justice.

This appeal arises from a dispute as to whether Lee M. and Judith Stenehjem waived their right under a 1961 agreement with T. W. and Marie Sette to require the Settes to offer stock in the State Bank of Burleigh County to the Stenehjems before selling it to an outsider. The trial court held that the provisions of the agreement had been waived. We affirm.

## FACTS

The State Bank of Burleigh County was formerly located in the small town of Sterling, North Dakota, about 24 miles from Bismarck. It was owned by the Wildfang family. During 1960, Lee M. Stenehjem and T. W. Sette, both of whom had many years of experience in the banking business, conceived the idea of buying a majority interest in the bank and moving it to Bismarck. They and their wives entered into an "option agreement" with Henry Wildfang, representing himself and other stock-

holders owning a majority of the shares of stock of the bank. The agreement provided that the Settes and the Stenehjems had the option of purchasing not less than 600 of the 1,000 shares of stock by making certain payments at designated times and that the Stenehjems and the Settes had the privilege of voting certain Wildfang shares even prior to delivery. Over a period of two or three years, 600 shares were purchased under the option agreement.

All parties agreed that the purpose of the purchase was, in Mr. Stenehjem's words, that "we wanted a controlling interest in order to be able to properly control and to manage the operation of the bank."

In January 1961, the Settes and the Stenehjems entered into an agreement. It provided that if either of the Settes, or either of the Stenehjems, decided to sell any of his or her stock it would first be offered to his or her spouse, and if not purchased by the spouse, to the other couple. The price at which sale was to be offered to the other couple was specified as "an amount equal to the book value at the time of sale plus the same ratio over and above book value as was paid when the stock was originally acquired." The purchase price from the Wildfangs was between one and two percent above book value.

The agreement further provided:

"4. It is further understood and agreed by and between the parties hereto that it is their intention that the stock ownership remain equal between the parties of the first part and the parties of the second part and in the event of the acquisition of any of the shares of the capital stock of said State Bank of Burleigh County are acquired or offered to either of the parties hereto, they shall immediately convey this information to the other party and the parties shall be entitled to purchase and acquire said shares equally.

.    .    .    .    .

"6. The shares of stock herein referred to shall each have stamped, typed or printed thereon, the notation that said shares of stock are held pursuant to a stock purchase agreement dated the date of this agreement and referring thereto. This notation shall also be placed on additional shares as and when they may be acquired."

This is the agreement which is the basis of the dispute between the parties.

The Settes and the Stenehjems assumed control of the bank, moved it to Bismarck, and had no difficulties with each other for years. The Settes lived in Bismarck and Mr. Sette was president and chief executive officer of the bank. The Stenehjems lived in Watford City, where Mr. Stenehjem managed another bank, and he was in contact at least weekly with Mr. Sette.

On October 1, 1970, Mr. Sette suffered a stroke, which affected his memory progressively. James Sette, his son, after being trained in banking elsewhere, was working for the bank in various capacities, and gradually assumed some of his father's duties. Disagreements arose between the Settes and the Stenehjems. One related to the proposed purchase of a building near the bank, favored by the Settes and opposed by the Stenehjems. Another arose from the desire of the Settes to have James named president. This was also opposed by the Stenehjems.

On January 10, 1972, the Stenehjems, without the knowledge of the Settes, entered into an agreement with the Wildfang heirs, under the terms of which the Stenehjems and the Wildfangs agreed to "vote their shares as a block . . . to support the elevation of L. M. Stenehjem as chief executive officer of said bank by whatever means he deems necessary;" that they would "vote as a block against any purchase by said bank of any new building or additions to the present building if doing so would require the issuance of additional capital stock [or] any additional contribution by the present stockholders to pay for the same, or the issuance of additional stock or any kind of assessment against the present stockholders to increase the capital

stock of said bank; . . ." The agreement also provided that the Stenehjems would, in the event they wished to purchase the outstanding capital stock owned by the Settes, "also buy all the capital stock owned by [the Wildfangs], for the same consideration per share;" and the Stenehjems further agreed "that they will not sell their shares in said State Bank of Burleigh County without also including in said sale all the shares of stock owned by [the Wildfangs]; . . . ."

When the Stenehjems, together with the Wildfangs, placed Stenehjem in office as the chief executive of the bank, the Settes apparently realized that they were then in a minority position. James Sette resigned in June 1972. Theodore Sette retired in December 1972. At a party given to celebrate his retirement, in January 1973, the Stenehjems and the Settes had a discussion during which Mr. Stenehjem indicated a willingness to buy the Sette stock.

In April 1973, there was a meeting at which the Wildfangs offered their remaining stock for sale to the Stenehjems. The Settes were not present at, or told of, this meeting. The Stenehjems declined to purchase.

In October 1973, at a meeting of the board of directors, James Sette moved to hire a firm of accountants to value the stock for the purpose of making a sale of the Sette stock. The motion was withdrawn, but renewed the next month, at which time it passed. At the October meeting Mr. Stenehjem produced a copy of the January 1961 agreement. This was the first James Sette knew of it. His father, perhaps because of the stroke, had no recollection of it, nor did his mother. There is a factual dispute as to whether the agreement had been mentioned at the retirement party or the meeting in April 1973, with the Wildfangs.

Between 1961 and 1973 there had been a number of transfers of stock, with little if any regard for the January 1961 agreement. During this period the number of shares of stock issued had been increased to 4,400 shares. Out of the total 4,400 shares

of stock, 200 had been issued to James Sette, 5 shares to his brother, Robert Sette, 43 shares to various relatives of the Stenehjems, and 50 shares transferred from the Settes to various business people in Bismarck. Two hundred shares had been purchased, equally by the Stenehjems and the Settes, from another stockholder. At the time of trial, in February of 1975, the plaintiff Stenehjems owned 1,176 shares of stock and the defendant Settes owned 1,115 shares of stock. The Wildfang ownership of 974 shares will be mentioned later.

Up until the eve of trial, no shares of stock had ever been stamped with the notation that they were subject to the January 1961 agreement, as required by paragraph 6 of that agreement.

James Sette testified that he twice offered the Sette stock to Mr. Stenehjem, getting as far as to say that the Sette stock was for sale, but that he was cut off by Stenehjem's changing the subject before the matter of price could be discussed.

On September 21, 1973, the Settes and James Sette and his wife gave an option to Victor R. Uttke and his wife, of Baker, Montana, to purchase their stock, for cash, until December 13, 1973. The Wildfang heirs gave Uttke a similar option as to their stock on the same day. The Stenehjems were not advised of this development. They learned something about it when a friend sent them a clipping from a Montana paper, dated November 15, 1973, stating that Uttke was moving to Bismarck to manage a bank. Six days later, the Stenehjems visited with the Settes and there was some discussion as to sale of stock, but the Settes apparently did not disclose that they had given an option to sell their shares.

In November 1973, Mr. Uttke telephoned Stenehjem and asked if the Stenehjems' shares were for sale. Stenehjem indicated that they were not, and said that he knew all the other stockholders and was sure that no block of shares was for sale, and he cut the conversation short. He did not disclose the existence of the agreement of January 1961, and Uttke did not tell Stenehjem that

he already held options for a majority interest in the bank.

It appears that all of the three major participants in these negotiations, the Settes, the Stenehjems, and Uttke, were playing close to the vest with each other. In such dealings, it was almost inevitable that one of the three would end up as a disgruntled minority stockholder. It turned out to be the Stenehjems, the same parties who had previously placed the Settes in a minority voting position by the January 10, 1972, agreement with the Wildfangs.

Mr. Uttke, however, had no knowledge of the 1961 agreement between the Stenehjems and the Settes until after the October 1973 meeting of the board of directors, when the agreement was produced. He learned of it through a telephone call thereafter. In the meantime, he had paid out many thousands of dollars on options to buy the stock from the Settes and the Wildfangs, had resigned a bank presidency in one bank and directorships in several other banks in Montana, and had moved to Bismarck. He had also, on the advice of his attorney, asked to see a stock certificate, with the thought in mind that any restrictions on sale would be shown on the stock certificate. He was shown a certificate of stock of Robert Sette's, and ascertained that it bore no restriction on sale.

The action before us was brought by the Stenehjems against the Settes and Uttke to require the Settes to sell their stock to the Stenehjems. After a trial, the district court ruled that the Stenehjems had waived their rights under the January 1961 agreement because (1) none of the stock certificates was ever endorsed with the restrictions upon its sale, as required by the January 1961 agreement; (2) numerous sales and transfers of stock were made without direct consent by both major stockholders, including the transfer of 200 shares to James Sette; (3) the Stenehjems, by entering into the January 10, 1972, Wildfang agreement to vote their shares as a block and require any purchaser to buy the shares of both the Stenehjems and the Wildfangs, took a position inconsistent with the Sette-Stenehjem agreement and thereby waived it. Having decided the case on principles of waiver, the court specifically declined to rule upon issues of estoppel.

## DECISION

North Dakota at present has no statute law affecting the validity of option agreements between stockholders which limit freedom of sale to third parties. Nor do we have any statute relating to the affixing of notice of such restrictions on stock certificates. When this State adopted the Uniform Stock Transfer Act (formerly Chapter 10–18, N.D.C.C.), Section 15, which contained a requirement that notice of restrictions on sale be printed on the certificates, was omitted. The Uniform Stock Transfer Act was repealed [see note following § 41–09–53, N.D.C.C.] by adoption of the Uniform Commercial Code, which is now codified as Title 41, N.D.C.C. The Uniform Commercial Code contains no comparable provision as to private contractual limitations on sale, although it contains a provision requiring the affixing of notice of restrictions created by the issuer. Sec. 8–204, UCC (§ 41–08–12, N.D.C.C.).

We therefore construe the agreement of January 1961 as we would construe any other private agreement on the same subject matter, bearing in mind the fact that restrictions on the free marketability of securities are looked upon with disfavor. *Remillong v. Schneider*, 185 N.W.2d 493 (N.D.1971), syllabus ¶ 1; *Thompson v. Anderson*, 209 Kan. 547, 498 P.2d 1, 55 A.L.R.3d 710 (1972).

The provisions of such agreements, of course, may be waived, just as the provisions of other agreements may be waived.

We have defined "waiver" as the voluntary and intentional relinquishment and abandonment of a known existing right, advantage, benefit, claim, or privilege which, except for such waiver, the party would have enjoyed. *Gajewski v. Bratcher*, 221 N.W.2d 614 (N.D.1974). See also *Pollock v. McKenzie County Public School Dis-*

*trict No. 1*, 221 N.W.2d 521 (N.D.1974). Although closely related to estoppel, waiver is a somewhat different concept.

■ We agree with the trial court that the items specified above as grounds for finding that a waiver existed are sufficient to justify such a finding.

As is stated in *Thompson v. Anderson, supra,* 498 P.2d 1, at 7–8,

"The purpose of a first-option provision is to prevent or discourage a sale of stock to outsiders so as to preserve the continuity of management. Such provisions, however, are generally regarded with disfavor and are strictly construed. Where a first-option agreement exists, compliance with such agreement may be waived by acquiescence in a transfer of the particular stock, by failure to exercise the option within due time or by prior dealings or a course of conduct on the part of the stockholder seeking to enforce the agreement directly inconsistent with a position subsequently taken."

■ The Stenehjems assert, however, that Uttke cannot show the good faith requisite to a claim of waiver because he is not a "bona fide purchaser" as defined under the Uniform Commercial Code, Section 41–08–18, N.D.C.C. (UCC § 8–302), because the stock has not been delivered to him. We hold that there can be a waiver regardless of whether or not the person claiming the waiver is a bona fide purchaser. It was so held under the Uniform Stock Transfer Act. *Costello v. Farrell,* 234 Minn. 453, 48 N.W.2d 557, 29 A.L.R.2d 890 (1951); *Hopwood v. Topsham Telephone Co.,* 120 Vt. 97, 132 A.2d 170 (1957).

■ The Stenehjems also cite *Tu-Vu Drive-In Corp. v. Ashkins,* 61 Cal.2d 283, 38 Cal.Rptr. 348, 391 P.2d 828 (1964), for the proposition that one cannot claim reliance upon the facts justifying waiver if the option under which he claims has been renewed after knowledge of the facts reached him. Such a holding in the *Tu-Vu* case was a secondary holding, and it does not appear

what consideration, if any, was given for the option. In the case before us, Uttke had paid out very substantial amounts of money for the option and incurred other detriments which were substantial. Under such circumstances we do not hold, and we doubt that the California court would hold, that he lost his right to claim a waiver merely because he succeeded in obtaining a renewal of an option after notice of an adverse claim and thereby maintained such rights as he had under the preexisting option.

We think it is very pertinent to the question of waiver, as well as the question of estoppel, that Uttke has suffered the detriment of having paid out $40,000 for his stock option, money unavailable to him while this action was pending, and that he resigned the presidency of a bank in Montana and the directorships of other banks and moved to this State, all in reliance on the sales to him, and particularly in reliance on the absence of any restriction on the certificate of stock he examined.

As to estoppel generally, see *Farmers Cooperative Association of Churchs Ferry v. Cole,* 239 N.W.2d 808 (N.D.1976), and *Cranston v. Winters,* 238 N.W.2d 647 (N.D.1976), and cases cited in each.

■ Of all the parties, it appears that Uttke has the best claim of waiver or estoppel, and has ample grounds to assert that both the Stenehjems and the Settes have waived, and are estopped from asserting, any restrictions upon the transfer of stock to him on the basis of the 1961 agreement. There is no indication that he had notice of any restriction prior to the time he had committed his money on the option, and incurred the other detriments mentioned.

Similarly, the Settes have ample bases for their claim of waiver, grounded on the Stenehjem-Wildfang agreement to vote and (if the Stenehjem stock were sold) sell their stock in a block, thereby frustrating the purpose of the 1961 agreement (to keep control in the hands of the Settes and the Stenehjems acting together), as well as the

failure to have the sale restrictions noted on the certificates, and the condoning of small transfers of Sette stock as well as Stenehjem stock. On the latter point, see cases collected at 55 A.L.R.3d 723, 726–731.

Affirmed.

PEDERSON and SAND, JJ., and RALPH B. MAXWELL and WM. F. HODNY, District Judges, concur.

RALPH J. ERICKSTAD, C. J., and WM. L. PAULSON, J., deeming themselves disqualified, did not participate; RALPH B. MAXWELL and WM. F. HODNY, District Judges, sitting in their stead.