Alton Glenn SORLIE, Plaintiff
and Appellee,

and

The Bismarck Tribune Company, Involuntary Plaintiff and Appellee,

v.

Dale Sorlie NESS, Clayton O. Panter, Bradley F. Henke, Dale V. Ness, and Logansport Newspapers, Inc., a corporation; and Dale S. Ness and Dale V. Ness as Trustees under the Will of Evelyn Irene Ness, Defendants and Appellants.

Civ. No. 10114.

Supreme Court of North Dakota.

Aug. 17, 1982.

John A. Zuger and Lyle W. Kirmis, of Zuger & Bucklin, Bismarck, for plaintiff and appellee.

A. William Lucas, of Lundberg, Conmy, Nodland, Lucas & Schulz, Bismarck, for involuntary plaintiff and appellee.

Christine A. Hogan and Harold L. Anderson, of Pearce, Anderson & Durick, Bismarck, for defendants and appellants.

VANDE WALLE, Justice.

This is an appeal from a declaratory judgment entered pursuant to Chapter 32–23, N.D.C.C., construing a document entitled "Stock Transfer Agreement With Option," dated April 3, 1956 ("1956 Agreement"), and signed by Stella Mann and Evelyn Ness. We affirm.

The 1956 Agreement provides, in its entirety:

"KNOW ALL MEN BY THESE PRESENTS:

"WHEREAS, STELLA IRENE MANN, of Bismarck, North Dakota, as PARTY OF THE FIRST PART, has heretofore transferred ten shares of stock in the Bismarck Tribune Company, a North Dakota corporation, Bismarck, North Dakota, to EVELYN IRENE NESS, of Whitesboro, New York, as PARTY OF THE SECOND PART, and the parties having entered into an agreement relative to the consideration thereof, DO NOW FURTHER AGREE:

"1. That in consideration of the premises and the covenants of the parties heretofore made, the PARTY OF THE SECOND PART agrees not to assign, transfer, sell, or convey the said stock, or any part thereof, without the written consent of the PARTY OF THE FIRST PART.

"2. That in the event it shall become necessary or should PARTY OF THE FIRST PART deem it advisable to sell all of the issued stock in the corporation to another firm or corporation, PARTY OF THE SECOND PART grants to PARTY OF THE FIRST PART full authority to assign, transfer, and convey the stock herein mentioned as fully and effectually as PARTY OF THE SECOND PART might or could do, and that payment upon such transfer shall be made to PARTY OF THE SECOND PART in accordance with a prior agreement of the parties.

"3. That PARTY OF THE SECOND PART *specifically agrees, in the event she should desire to sell or transfer the stock, that she will grant and does grant a prior option to purchase* to Alton Glenn Sorlie at the established book value for such stock; and in the event the said Alton Glenn Sorlie shall not exercise such option to purchase within a period of ninety (90) days, then a similar offer shall be made to the Bismarck Tribune Company, and, if such company does not elect to purchase the stock, then the PARTY OF THE SECOND PART shall have the right to dispose of the same to any person as she may desire.

"4. *That this agreement shall be binding upon the heirs, personal representatives, and assigns of the parties.*" [Emphasis added.]

Subsequent to the execution of the 1956 Agreement there was a stock division of Bismarck Tribune Company stock into Class A voting stock and Class B nonvoting stock, a recapitalization of the stock, and a dividend distribution upon both classes of stock on a ratio of 20 to 1. As a result of those actions each share of Bismarck Tribune Company stock became 21 shares of Class A voting stock and 21 shares of Class B nonvoting stock. Thus the ten shares of stock referred to in the 1956 Agreement became the equivalent of 210 shares of Class A stock and 210 shares of Class B stock.

Subsequent to the stock division, recapitalization, and dividend distribution the total authorized and outstanding stock of the Bismarck Tribune Company consisted of 2,541 shares of Class A voting stock and 2,541 shares of Class B nonvoting stock held by the shareholders as follows:

| | Class A Shares | Class B Shares |
|---|---|---|
| Stella Mann | 1,449 | 1,449 |
| Glenn Sorlie | 546 | 546 |
| Evelyn Ness | 483 | 483 |
| Others | 63 | 63 |
| | 2,541 | 2,541 |

During 1971 Glenn Sorlie exercised an option to purchase 800 shares of Class A voting stock from Stella for a total price of $28,568. During 1972 Glenn purchased 21 shares of Class A voting stock and 21 shares of Class B nonvoting stock from William Moeller, and Glenn transferred 13 shares of his Class A voting stock to Helen Sorlie.

Stella died in 1973. At the time of her death she held 649 shares of Class A Bismarck Tribune Company voting stock, all of which she requeathed to Evelyn. She also held 1,449 shares of Class B nonvoting Bismarck Tribune Company stock which she bequeathed to Evelyn and Glenn, with each receiving one-half of those shares.

Evelyn died in 1976. She did not sell or otherwise transfer during her lifetime any of the Bismarck Tribune Company stock that she had acquired, but she bequeathed all of that stock to her husband, Dale V. Ness, her son, Dale S. Ness, and the Evelyn Sorlie Ness Trust. Glenn, as president of the Bismarck Tribune Company, issued stock certificates to Evelyn's beneficiaries with no restrictions endorsed on the face of the certificates.

During July 1978 Glenn contracted to sell 2,545.5 shares of Bismarck Tribune Company stock to Lee Enterprises, Inc., at $1,800 per share, for a total price of $4,581,900. By that sale Lee Enterprises, Inc., purchased all of Glenn's stock in the Bismarck Tribune Company except 100 shares of Class A stock to which it received an option to purchase from Glenn. During August 1978 the beneficiaries of Evelyn's Bismarck Tribune Company stock gave Logansport Newspapers, Inc., an option to purchase all their stock (922 Class A shares and 997.5 Class B shares) with the exception of 210 shares of Class A and 210 shares of Class B stock which were labeled "tainted shares,"

the sale of which was to depend upon the ultimate determination of the various parties' rights under the 1956 Agreement. Logansport Newspapers, Inc., agreed to pay them, upon exercise of its purchase option, $1,997.94 per share for a total price of $3,835,045.83.

During October 1978 Glenn was notified that Dale S. Ness desired to transfer two shares of Bismarck Tribune Company stock which he had inherited from Evelyn: one share to Bradley F. Henke and one share to Clayton O. Panter. Upon receiving notice of the attempted transfer of those two shares, Glenn advised Dale S. Ness that he was going to exercise his option to purchase the two shares of stock pursuant to the 1956 Agreement. The Nesses responded that in their opinion the 1956 Agreement no longer was valid, and thereafter Glenn filed a declaratory-judgment action requesting the district court to construe the agreement.

The district court, by allowing the introduction of parol evidence to explain the 1956 Agreement, impliedly determined that it was ambiguous. See *National Bank of Harvey v. Pauly*, 280 N.W.2d 85 (N.D.1979). The district court construed paragraph No. 3 of the 1956 Agreement as giving Glenn an option to purchase Evelyn's stock covered by the agreement if that stock was sold or transferred by a Ness to a third party outside the Ness family. The district court concluded that the option to Glenn was not triggered by a devolution of the stock under Evelyn's will to her husband, her son, and the Evelyn Sorlie Ness Trust and that the 1956 Agreement survived Evelyn's death so that the sale of Evelyn's stock by one of her beneficiaries to a third party triggered Glenn's option to purchase the stock. The district court further concluded that the Nesses' sale of the Bismarck Tribune Company stock to Logansport Newspapers, Inc., triggered Glenn's option rights under the 1956 Agreement, entitling him to purchase 210 shares of Class A stock and 210 shares of Class B stock from Dale V. Ness, Dale S. Ness, and the Evelyn Sorlie Ness Trust on a pro rata basis according to the number of

shares each had received from Evelyn.[1] The parties stipulated that the book value of the Bismarck Tribune Company stock, for purposes of ascertaining the purchase price at which Glenn could acquire the stock through his option under the 1956 Agreement, is $322.75 per share.

On appeal the Nesses assert that the district court incorrctly construed the 1956 Agreement and further assert that the 1956 Agreement no longer is in effect nor binding upon them.

■ The construction of a written contract to determine its legal effect is a question of law for the court to decide. *Metcalf v. Security International Ins. Co.*, 261 N.W.2d 795 (N.D.1978). The determination of whether or not a contract is ambiguous is also a question of law for the court to decide. *Schulz v. Hauck*, 312 N.W.2d 360 (N.D.1981); *Grove v. Charbonneau Buick-Pontiac, Inc.*, 240 N.W.2d 853 (N.D.1976). Pursuant to Section 9–07–04, N.D.C.C., the intention of the parties under a written contract is to be ascertained from the writing alone if possible. If the parties' intentions can be ascertained from the writing alone, without reference to extrinsic evidence, then the interpretation of the contract is entirely a question of law, and this court will independently examine and construe the contract to determine whether or not the district court erred in its interpretation of it. *Metcalf v. Security International Ins. Co., supra; Stetson v. Blue Cross of North Dakota*, 261 N.W.2d 894 (N.D.1978). But, if the parties' intentions cannot be determined from the writing alone and reference must be made to extrinsic evidence, then those questions in regard to which extrinsic evidence is adduced are questions of fact to be determined by the trier of fact. *Farmers Elevator Company v. David,*

234 N.W.2d 26 (N.D.1975); *Stetson v. Investors Oil, Inc.*, 140 N.W.2d 349 (N.D.1966).

Upon reviewing the 1956 Agreement we agree that the provisions relevant to this litigation are ambiguous and that the parties' intentions, as expressed by the language used in the agreement, cannot be ascertained by the writing alone.

■ Provisions which restrict a shareholder's right to sell or transfer stock ordinarily are looked upon with disfavor and are strictly construed. *Stenehjem v. Sette*, 240 N.W.2d 596 (N.D.1976); *Remillong v. Schneider*, 185 N.W.2d 493 (N.D.1971). However, this court, in recognizing that principle in *Kutchera v. Kutchera*, 189 N.W.2d 680, 685 (N.D.1971), stated:

"Generally speaking, the owner of corporate stock has the absolute right to transfer his stock, except insofar as that right is restricted by the corporate charter or the articles of incorporation, by statute, by valid bylaw or resolution, *or by agreement.* . . .

"It has been held that even an invalid bylaw may operate as a binding agreement upon those who assent to it, if it is not contrary to public policy. . . . However, stockholders' agreements restricting sale of corporate stock to remaining stockholders before selling to strangers will be construed so as to give the widest range of choice permissible *under the language used in the agreement.*" [Emphasis supplied.]

See also *Chaffee v. Farmers Elev. Co.*, 39 N.D. 585, 168 N.W. 616 (1918).

■ The court may not rewrite a shareholders' agreement under the guise of relieving one of the parties from the apparent hardship of an improvident bargain. *Simp-*

1. In this regard the judgment specifically provides:

"That the book value of the stock of The Bismarck Tribune Company, as of August 15, 1978, was $322.75 per share, as agreed between the plaintiff and the defendants. Plaintiff, Sorlie, is entitled to purchase at said book value, as of August 15, 1978, 210 shares of each class of stock. The purchase shall be .93 shares of Class A. stock from Dale S.

Ness, and 209.07 shares of Class A. stock from Dale V. Ness, and 10 shares of Class B. stock from Dale V. Ness and 200 shares of Class B. stock from the Evelyn S. Ness Trust. This judgment is binding upon the successors in interest, and assigns of the parties, including Logansport Newspapers, Inc., and shall be transferred free of any claims or interest of any of the defendants."

son v. *Young*, 369 So.2d 376 (Fla.App.1979). As this court also recognized in *Remillong*, a provision restricting the transfer of stock in a close corporation [2] is important to protect the corporation and its stockholders from its competitors and from other undesirable outside influences. The court in *Remillong* did not set aside a stock transfer because in that instance the stock transfer was made to another shareholder of the corporation. The court concluded that the sole purpose of the restriction requiring the stockholder, before selling his stock, to first offer such stock to the corporation at fair book value was to protect the corporation and its shareholders from outside influence. Because the sale of the stock was to another shareholder of the corporation the *Remillong* court held that the sale of the stock did not violate the purpose of the restriction.

In *Stenehjem v. Sette, supra*, the court found a waiver of a restriction on the sale of stock because of failure to comply with the agreement requiring the restriction to be endorsed upon the stock certificate. The opinion of the court reveals that there was no indication the purchaser of the stock had notice of any restriction prior to the time he had committed his money and incurred other detriments. Here, there is no doubt that not only Evelyn's heirs—who gave no consideration for the stock they received under Evelyn's will—but also Logansport Newspapers, Inc., had knowledge of the restriction.[3] *Remillong* and *Stenehjem* thus are distinguishable on their facts from the in-

stant case. See *F. H. T., Inc. v. Feuerhelm*, 211 Neb. 860, 320 N.W.2d 772 (1982).

■ Here, the transfer of the stock was to persons outside the corporation. In this instance the facts leave no doubt that at the time of the agreement the corporation was a "close corporation," the stock of which was owned by the Mann family, and that Stella controlled the corporation. Therefore, while a strict construction of a provision restricting the sale of stock is the general rule, in a "close corporation" it should not be applied to defeat the intent of the agreement. As noted by the Supreme Court of Mississippi in *Fayard v. Fayard*, 293 So.2d 421, 423 (Miss.1974):

"Restrictions upon the right to transfer were once regarded with disfavor by the courts upon the theory that they impinged upon the right to alienate personal property. As a general proposition today a majority of the courts will sustain the restrictions in close corporations which are determined to be reasonable in the light of relevant circumstances. 2 O'Neal, *Close Corporations*, § 7.06 (1971). The underlying test for determining reasonableness is whether the restraint is sufficiently needed by the particular enterprise to justify overriding the general policy against restraints on alienation. 12 Fletcher Cyclopedia, Corporations (Perm.Ed.) § 5461.3 (1971)."

See also *F. H. T., Inc. v. Feuerhelm, supra.*

■ A closely held business is frequently put in the form of a corporation instead of

**2.** A "close corporation" means, in the vernacular, "a corporation in which the stock is held in few hands, or in few families, and wherein it is not at all, or only rarely, dealt in by buying or selling." *Brooks v. Willcuts*, 78 F.2d 270, 273 (8th Cir. 1935). For similar definitions see O'Neal, *Close Corporations*, § 1.02 (1971).

**3.** Thus the agreement between Evelyn's heirs and Logansport Newspapers, Inc., dated August 15, 1978, whereby the heirs agreed to sell the stock to Logansport contains the following provision:

"Stella Mann made a gift of 10 shares of Bismarck [the name used in the agreement to identify the Bismarck Tribune Company] to Evelyn Sorlie Ness at some time on or about or before April 3, 1956, and there was as of such date an agreement entered into between

Stella Mann and Evelyn Sorlie Ness, identified as 'Stock Transfer Agreement with Option' (Stella Mann Contract). Alton G. Sorlie and/or Bismarck may claim some right(s) under the terms of that instrument. By reason of recapitalizations of Bismarck, said 10 shares may now represent 210 shares of Class A stock and 210 shares of Class B stock of Bismarck, said stock being hereinafter referred to in this contract as the 'tainted shares' and the shares other than the tainted shares held by Ness Shareholders may hereafter be referred to as the 'free shares.'

"Logansport is, under the provisions of this contract, purchasing the free shares from the Ness Shareholders and none of the tainted shares."

a partnership to escape unlimited liability to which general partners are subject and to obtain other advantages and, though a close corporation remains unaffected by the death of any of its shareholders, the disposition of a deceased minority shareholder's interest may often prove just as difficult as the disposal of a partnership interest. The use of certain restrictions on the transfer of shares imposed by charter or bylaw provision, or some agreement between the shareholders or between the shareholders and the corporation, are some of the devices evolved for assuring the succession in interest of persons most likely to act harmoniously with the other shareholders. 12 Fletcher Cyclopedia, *Corporations* (Perm.Ed.), § 5461.1, at 191. The most popular restraint is the first-refusal option because it is considered the most serviceable and fairest type of restraint and also because of its universal acceptance as to its legal validity. The option may be granted to the corporation, to its shareholders, or to both. 12 Fletcher Cyclopedia, *Corporations* (Perm. Ed.), § 5461.1, at 192.

In return for the ten shares of stock that Evelyn received from Stella, Evelyn agreed under paragraph No. 1 of the agreement that she would not "assign, transfer, sell, or convey" any part of the stock without first obtaining Stella's consent; under paragraph No. 2 she agreed that in the event Stella decided to sell all of the Bismarck Tribune Company stock Evelyn would give Stella full authority to "assign, transfer, and convey" her stock referred to under the 1956 Agreement; and under paragraph No. 3 Evelyn agreed that in the event she "should desire to sell or transfer the stock," Glenn and then the Bismarck Tribune Company would have prior options to purchase the stock.

The language of paragraph No. 3 regarding Glenn's first option to purchase in the event Evelyn should "desire to sell or transfer the stock," is unambiguous. It does not contain any express language placing restrictions upon testate or intestate succession of the stock from Evelyn to another or placing restrictions upon the sale or transfer of the stock by someone other than Evelyn. There is no doubt that paragraph No. 3 granted Glenn a first-refusal option during Evelyn's lifetime. But paragraph No. 4 makes the agreement binding upon Evelyn's heirs, personal representatives, and assigns. Should we—consistent with the rule that restrictions upon a stockholder's right to sell or transfer are to be strictly construed to permit the widest range of choices possible—construe paragraph No. 3 as giving first-refusal options to Glenn and the Bismarck Tribune Company only in the event that Evelyn, during her lifetime, decided to sell or otherwise transfer the stock, and further construe paragraph No. 3 as a personal restriction upon Evelyn's sale or transfer of the stock, such restriction to terminate upon her death; or should we construe the provisions of paragraph No. 4 of the agreement to make the agreement binding upon Evelyn's heirs after her death? Depending upon the answers, a further question arises as to whether or not Evelyn's bequests of stock triggered the option. In the instant case we believe that the agreement is to this extent ambiguous and we therefore agree with the trial court's conclusion to that effect.

We are aware that at least one court has construed provisions similar to those in paragraph No. 4 of the agreement to mean that only if Evelyn contracted to sell the stock during her lifetime would the agreement be binding upon her heirs and personal representatives. *Vogel v. Melish*, 31 Ill.2d 620, 203 N.E.2d 411 (1964), involved the interpretation of a 1954 stockholders' agreement under which two stockholders agreed that if either party desired to sell, transfer, assign, convey, or otherwise dispose of all or part of his shares, he first was to offer such shares to the other. The agreement included a provision similar to paragraph No. 4 of the 1956 Agreement in this case which stated:

"6. The parties hereto further agree that the provisions of this agreement shall be binding upon and inuring to the benefit of the parties hereto and their respective administrators, executors, heirs and personal representatives." 203 N.E.2d at 412.

The Illinois Supreme Court, following the rule of strict construction of stockholders' agreements which places a restraint on the alienation of stock, concluded that the agreement was a personal obligation upon the parties which did not survive the death of either of them. Regarding the effect of the foregoing quoted provision the Illinois Supreme Court stated:

> "We again agree with the Appellate Court that the sixth paragraph of the stockholder's agreement, in view of the personal character of the agreement, does not negate the implied condition that death of either party excuses the survivor from further performance and is properly construed as applying only where the parties during their lifetimes contract for the sale of shares pursuant to the agreement." 203 N.E.2d at 414.

We do not agree with the reasoning of the Illinois court. Such an artificial interpretation of the provision in paragraph No. 4 of the agreement in the name of strict construction has the effect of rewriting the agreement under the guise of relieving one of the parties from the apparent hardship of an improvident bargain. *Simpson v. Young, supra.* In *E. E. E., Inc. v. Hanson,* 318 N.W.2d 101 (N.D.1982), we said that parties to a contract are allowed to write the terms of the contract themselves and that although a court may be called upon to interpret a contract written by the parties thereto, the court does not have the authority to modify it. Because an agreement to sell stock is not an agreement requiring personal acts on the part of the seller, the agreement would not terminate upon the death of the seller. *Minnehaha County v. Willadsen,* 69 S.D. 412, 11 N.W.2d 55 (1943); 17A C.J.S. *Contracts* § 465 at 626–627. Therefore, if we were to construe paragraph No. 4 of the agreement as merely requiring Evelyn's heirs or personal representatives to execute a contract to sell stock entered into by Evelyn during her lifetime we would render idle and useless the words in paragraph No. 4 because without such words the heirs and personal representatives would nevertheless be required to complete the sale. A contract must be read, considered, and construed as an entirety, so that all the provisions of the agreement will be taken into consideration and construed together to ascertain the meaning and effect of the instrument. *Gift v. Ehrichs,* 284 N.W.2d 435 (N.D.1979). Section 9–07–06, N.D.C.C., requires that we interpret the whole of a contract so as to give effect to every part if reasonably practicable, and further states that each clause is to help interpret the others. See *Park View Manor v. Housing Authority, etc.,* 300 N.W.2d 218 (N.D.1980). Were we, in the name of strict construction, to interpret paragraph No. 4 as simply requiring the heirs and personal representatives of Evelyn to do what they would be required to do were paragraph No. 4 not part of the agreement, we would not interpret the contract as required by the statutes of our State. Although we may apply a rule of strict construction to certain types of contractual provisions, that rule does not entitle us to render provisions of the contract worthless in the name of that rule.

Because we have concluded that the provisions of the 1956 Agreement which are relevant to this litigation are ambiguous, it is necessary and appropriate to consider parol evidence for purposes of construing the agreement. Richard P. Rausch, the attorney who drafted the 1956 Agreement, testified regarding Stella's instructions for drafting and her intended purpose in executing the 1956 Agreement:

> "A. She wanted to insure that Glenn Sorlie, her nephew, would eventually ultimately secure effective management and control of the Bismarck Tribune.
>
> . . . . .
>
> "Q. What did Mrs. Mann tell you?
> "A. Her concern in this arrangement was that it be restricted as to sale to a third party—to strangers. She did not want strangers, such third parties, to become involved in the Bismarck Tribune, which would operate to the detriment of Glenn Sorlie in future years.
> "Q. Does 'strangers' include a non-Ness?

"A. Yes.

"Q. Did you understand that the thing that would give him the option was a sale?

"A. That is my understanding.

"Q. But as long as it continued in the Nesses through inheritance or gift, it was your understanding that you were to prepare an agreement that would permit that?

"A. That is correct. They were not strangers insofar as the family was concerned."

■ Although parol evidence is admissible to explain or clarify ambiguities within a written contract it is not admissible to add to or vary the terms of an integrated written contract. *Signal Drilling Co. v. Liberty Petroleum Co.*, 226 N.W.2d 148 (N.D.1975); *Johnson v. Auran*, 214 N.W.2d 641 (N.D.1974). The parol evidence admitted in this case was to the effect that Stella intended to give Glenn and the Bismarck Tribune Company options to purchase Evelyn's stock only in the event that the stock was transferred outside the Ness family. The parol evidence in this instance is consistent with the purpose for which first-refusal options in close corporations are designed. *Fayard v. Fayard, supra*; 12 Fletcher Cyclopedia, *Corporations*, § 5461.1; O'Neal, *Close Corporations*, § 7.06. Furthermore, the evidence logically explains the provisions of paragraph No. 4 of the agreement. Thus, if any sale or transfer by Evelyn triggered the option, a provision making the option binding on her heirs and personal representatives would be meaningless. On the other hand, if the provisions of paragraph No. 4 of the agreement are construed to mean that a transfer by will or intestate proceedings to one of Evelyn's heirs does not trigger the option but that a sale or transfer by the heirs to a third party does trigger the option, the meaning of the agreement becomes apparent. This construction is not only consistent with the purpose for which such agreements are designed; it is consistent with the construction placed upon first-refusal options by other jurisdictions in holding that a first-re-

fusal option in the context of a testamentary disposition requires more than language which refers to a "sale" to a third party, but requires that a restriction upon a testamentary disposition must be clearly and explicitly stated in the agreement. *Glenn v. Seaview Country Club*, 154 N.J.Super. 69, 380 A.2d 1175 (1977). It is also consistent with the rule that such restrictions are generally construed narrowly as applicable only to sales. *McLeod v. Sandy Island Corp.*, 265 S.C. 1, 216 S.E.2d 746 (1975).

■ In the context of the facts of this case, i.e., Evelyn's death and the testamentary disposal of her stock to her husband and son, members of her family, the agreement was ambiguous and parol evidence was properly admitted to determine its meaning. Parol evidence is admissible only to explain what the parties meant by what they said, not to show what they may have intended to say. *Quandee v. Skene*, 321 N.W.2d 91 (N.D.1982). This evidence does explain the meaning of paragraph No. 4 of the agreement within the context of the entire agreement.

The findings and conclusion of the trial court with respect to the meaning of the agreement are consistent with not only the purpose of such agreements in close corporations but also with the construction placed on such agreements by many of the jurisdictions which have considered these matters. The effect of the agreement is further evidenced by the agreements in which stock was given to other employees of the Bismarck Tribune Company containing provisions that the Tribune would have the option to purchase the stock should the employees determine to sell the stock or leave the employ of the Tribune Company. Evelyn, of course, was a member of the family, not an employee of the Tribune Company, and there was no need to insert such a provision in the agreement with her. The agreement did restrict the sale of the stock and provided that the restriction was binding upon her heirs. That restraint was not unreasonable but rather was consistent with other actions taken by Stella to ensure that the stock remained in the ownership of

the family and employees of the Bismarck Tribune Company.

Because we agree with the trial court that the agreement, in the context of the facts of this case, was ambiguous, it was proper for the trial court to admit parol evidence to assist it in determining the meaning of the agreement. The evidence sustains the findings of the trial court and they are not clearly erroneous. Rule 52(a), N.D.R.Civ.P. The conclusions of the trial court are sustained by the findings.

For the reasons stated herein, the judgment of the trial court is affirmed.

SAND, J., and BERNING, District Judge, concur.

BERNING, District Judge, sitting in place of PAULSON, J., disqualified.

ERICKSTAD, Chief Justice, dissenting.

I would construe the 1956 Agreement as giving prior purchase options to Glenn Sorlie and the Bismarck Tribune Company only in the event that Evelyn, during her lifetime, decided to sell or otherwise transfer the stock to someone else. Since Evelyn did not do so the 1956 Agreement terminated at her death, and neither Glenn Sorlie nor the Bismarck Tribune Company currently possess any purchase option rights by virtue of that agreement.

The majority is correct in its statement that provisions which restrict a shareholder's right to sell or transfer stock are ordinarily looked upon with disfavor and are strictly construed. I also agree with the majority's conclusion that the rule of strict construction should not be applied to defeat the express intent of an agreement. However, I do not agree that the rule of strict construction should not be applied when a close corporation is involved. The majority, under the guise of using a liberal construction of the 1956 Agreement, has, in essence, rewritten the agreement to provide restrictions on the transfer of Evelyn's stock which were not written into the agreement itself.

In *Remillong v. Schneider*, 185 N.W.2d 493 (N.D.1971), a case involving a closely held corporation, this Court stated that restrictions on a stockholder's right to sell or transfer stock should be strictly construed, and, in recognizing the legitimate purpose of such restrictions toward preventing sale to outsiders, we concluded, under syllabus 1:

> "Generally, the purpose of corporate by-laws restricting the sale of corporate stock is to prevent or to discourage sale to outsiders, and *such restrictive purposes must be specifically stated.*" [Emphasis added.] 185 N.W.2d at 494.

I would construe the language of paragraph four as making the 1956 Agreement enforceable against the "heirs, personal representatives and assigns of the parties" only in the event that the purchase options were triggered by Evelyn's attempt to sell or transfer the stock during her lifetime. Similar language was given that interpretation by the Supreme Court of Illinois in *Vogel v. Melish*, 31 Ill.2d 620, 203 N.E.2d 411 (1964). The majority concludes that such interpretation would render the words of paragraph four "idle and useless" because without that provision in the agreement Evelyn's "heirs and personal representatives would nevertheless be required to complete the sale." Under the majority's reasoning a contract provision could never be construed to accomplish an objective which the law might allow to be accomplished without the contract provision. I don't believe the majority's reasoning constitutes a valid rule of contract interpretation.

The majority has construed the 1956 Agreement to purvey an intent advocated by parol evidence which is contrary to and an unreasonable interpretation of the express language of the agreement. The parol evidence admitted in this case was to the effect that Stella intended to give Glenn and the Bismarck Tribune Company options to purchase Evelyn's stock only in the event that the stock was transferred outside the Ness family. However, the 1956 Agreement contains no language which is susceptible to that interpretation

of Stella's intent. Parol evidence is only admissible to explain what the parties meant by what they said, not to show what they may have intended to say. *See, Quandee v. Skene,* 321 N.W.2d 91 (1982). If it was Stella's intent for Glenn and the Bismarck Tribune Company to receive options to purchase Evelyn's stock in the event that the stock was ever transferred outside the Ness family, it was incumbent upon her to clearly place such restriction in the written agreement. She did not do so.

In accordance with these views I would reverse the judgment of the district court.

PEDERSON, Justice, dissenting.

I believe that Justice VandeWalle overlooks a couple of critical points and thus reaches the wrong conclusion. If any contract is ambiguous (and the majority here finds that the agreement between Stella and Evelyn is ambiguous), we are directed by §§ 9–07–14 and 9–07–19, NDCC, to interpret it as Evelyn understood it and most strongly against Stella, because she caused the uncertainty to exist. The cases have labeled contracts which are not "armslength" agreements, drafted by one party and merely "adhered" to by the other, as "contracts of adhesion." *See, for example, St. Ex Rel. Hagen, Etc., v. Bismarck Tire Ctr.,* 234 N.W.2d 224, 225 (N.D.1975). Strict scrutiny should be the standard. *Farmers Union Grain Terminal Ass'n v. Nelson,* 223 N.W.2d 494 (N.D.1974).

If the law, or precedent, or even logic, supports a philosophy of protection of "family" corporations, it should not be applied in this case. Everyone in the Mann-Sorlie-Ness family is out, or trying to get out, of the business of the Bismarck Tribune. I see no conduct by any of the parties which reflects other than a desire to get out with the most profit. I would treat this as if it were a legal dispute between Lee Enterprises, Inc., and Logansport Newspapers, Inc., apply Rule 52(a), NDRCivP, to the findings of fact, apply a strict construction so far as the conclusions of law are concerned, and reverse the judgment.