John GUNDERSON, Plaintiff and
Respondent,

v.

Gordon JOHNSON, Defendant and
Appellant.

No. 8173.

Supreme Court of North Dakota.

Jan. 15, 1965.

Rehearing Denied Feb. 5, 1965.

Ella Van Berkom, Minot, for appellant.

Farhart & Thomas, Minot, for respondent.

ERICKSTAD, Judge.

This is an appeal by the defendant, Gordon Johnson, from the judgment entered in favor of the plaintiff, John Gunderson, in Mountrail County District Court for $3,360 plus costs. A trial de novo is demanded.

The judgment was for money damages found by the district court to be due Gunderson for the loss of 15 cows (6 of which were with calf) and 1 bull, because of

Johnson's negligence in failing to properly care for and control the cattle while they were in his possession.

On appeal, Johnson contends that the evidence does not support the court's finding that he was negligent in the care of the cattle and, thus, that the complaint should be dismissed.

We shall attempt to summarize the pertinent facts.

In August, 1961, Gunderson lived 19 miles southwest of Ross and Johnson lived 13 miles south of Palermo (both located in Mountrail County, North Dakota), their farms being separated by about 30 miles.

Because of drouth conditions in Gunderson's area, he was without pasture for his cattle. Having been acquainted with Johnson for about eleven years and knowing that he "had been successful in farming for many years" and that he had in the past raised cattle, Gunderson placed his cattle with Johnson.

On August 26, 1961, Gunderson delivered to Johnson at the Johnson farm 26 cows, 1 bull, and 22 calves. The significant portions of a written agreement concerning these cattle, entered into on December 13, 1961, reads as follows:

"THIS AGREEMENT, entered into, in duplicate, this 13th day of December, 1961, by and between John Gunderson, Ross, North Dakota, and hereinafter referred to as the Party of the First Part, and Gordon Johnson, Palermo, North Dakota, and hereinafter referred to as the Party of the Second Part.

"WITNESSETH, That the Party of the First Part has delivered and left with the Party of the Second Part twenty-six (26) head of primarily Hereford cows, all of which are branded '96' or 'R/' (slash R), and one (1) bull also branded '96', and all of which brands appear on the right hip of each of said animals.

"It is further understood and agreed by and between the Parties hereto that the said Party of the Second Part shall furnish all care and feed of such livestock hereinbefore described and that in return therefor the said Party of the Second Part shall receive one-half (½) of the entire calf crop from said stock. The other one-half (½) of said calf stock to be turned over to the Party of the First Part, or sold or marketed on November 1st of each year during the term of this Agreement, unless otherwise mutually agreed between the Parties hereto.

"It is further understood and agreed by and between the Parties hereto that any loss by death from normal or ordinary causes shall be borne by the Party of the First Part.

"It is further understood and agreed by and between the Parties hereto that this Lease shall be effective irrevocably until November 1, 1962, and will be considered renewed from year to year on the same terms and conditions herein, subject only to termination by either Party by giving written notice of such intent to terminate to the other Party not less than thirty (30) days prior to November 1st in any such year in which termination is contemplated. The 30-day notice shall be computed from the postmark date on any such written notice, and which notice is addressed in the manner hereinbefore set forth as the residence of each of the Parties hereto."

On April 5, 1962, 15 of the cows and the bull died from consuming grasshopper poison which the cattle, while running at large, found in an old granary on the Per Anderson Estate farm, approximately one and one-quarter miles from the Johnson farm.

When the cattle were delivered to the Johnson farm, they were placed in Johnson's fenced pasture, which was near the farm buildings. When the cattle ate the

poison, they had been turned loose to graze at large in the area. Johnson and a number of his neighbors testified that it was customary in that neighborhood to permit cattle to run at large after the fall harvest and before the time that cattle would damage crops in the spring if permitted to continue to run at large. Johnson obtained specific permission to graze the cattle on the land of one of his neighbors by fencing the neighbor's two haystacks but had no permission to graze the cattle on the Anderson Estate land. He testified that he checked the cattle each day when they were running at large.

Arthur Eklund, who lived one and one-quarter miles north of Johnson's farm, in response to a question concerning the practice of permitting cattle to run at large in the fall, testified as follows:

"Q. And about how much, how many people are in that area that let their animals run?

"A. (Counting to himself) Oh, it must be 8, 6, 7, 9."

Our law in respect to livestock running at large reads:

"36–11–01. Stock running at large prohibited.—No cattle, horses, mules, swine, goats, or sheep shall be permitted to run at large." North Dakota Century Code.

The cattle had been permitted to run at large in the fall of 1961 following the grain harvest, had been kept in the barn during the winter, and ate the poisoned molasses-bran mixture when they were released to run at large in April, 1962. The poison had apparently been in the granary for about thirty years, dating back to the time when the townships handled the disposition of grasshopper poison. The Anderson Estate farm was unfenced and unoccupied and had been so for many years. Other cattle had run on this land since 1945.

Johnson knew that the door of the granary on the Anderson land had been destroyed, but he did not examine the granary to see if there was anything inside that would be injurious to cattle. His testimony in respect thereto is as follows:

"Q. When was this door kicked in by the horses on the building that contained the poison?

"A. It's been off of there for at least nine years.

"Q. But you never did know what was in there?

"A. No.

"Q. You have never gone on the property to look?

"A. I never paid any attention. I never paid any attention in that way."

Gunderson testified that he was at the Johnson farm in December, 1961, when the calves were picked up for sale. At that time the calves were in the pasture and the other cattle were near the buildings. He stated that on another visit to the Johnson farm later in December, 1961, he found the cattle four or five miles from the Johnson land. He said he told Johnson at that time that "he should keep a little closer watch, keep them a little closer to home."

Johnson testified that this visit took place in September or October, not in December; that the cattle were on that occasion grazing on the Anderson Estate land about one and one-quarter miles from the Johnson farm buildings; and that he does not recall a conversation in which Gunderson told him that the cattle should be kept closer to the farm.

Gunderson testified that the cattle had been fed molasses while they were in his possession.

Gunderson also testified that the cows with calf were worth $225 per head; the cows without calf, $190 per head; and the bull, $300.

Mr. Brown, a retired auctioneer and livestock dealer, testified that "the cows that are to calve and the ones that have calved have usually been selling at the same figure, between two hundred and two hundred and fifty at that time."

Johnson testified that the cows with calf were worth $200 per head; the cows without calf, $180 per head; and the bull, $300.

■ The bailor having alleged that his cattle were lost through the negligence of the bailee, the basic issue is whether the bailor has proved that the bailee was negligent in the care of the cattle entrusted to him. In deciding whether the bailee was negligent, let us examine the pertinent sections of our statutes to determine the degree of care required in this instance.

"60-01-10.  Storage—Definition—Depositary for hire—Definition.—Storage shall mean a deposit which is not gratuitous. The depositary in such case shall be called a depositary for hire."

"60-01-11. Depositary for hire must use ordinary care.—A depositary for hire must use at least ordinary care for the preservation of the thing deposited." North Dakota Century Code.

In a case involving depositary for hire decided by our court in 1908, we said:

"Error is assigned because the court did not allow a question as to defendant's reputation as a man of care in handling stock. It is conceded that the degree of care required by a depository for hire is ordinary care, and that ordinary care is such care or diligence as persons of ordinary prudence usually exercise about their own affairs of ordinary importance. Rev.Code 1905, §§ 5472, 6694; 3 Current Law, 162, note 68. We see no error in excluding evidence as to his reputation in this respect. The facts relating to this accident were all before the jury, and in such a manner that their verdict must be based upon the facts of this case, and, while the defendant's reputation may have been, and doubtless was, excellent in the matters referred to, yet, if he did not exercise ordinary care in this instance, his reputation for care could have no proper influence upon the deliberations of the jury. Lucia v. Meech, 68 Vt. 175, 34 Atl. 695." Mc-Bride v. Wallace, 17 N.D. 495, 117 N.W. 857, at 858.

Applying our law as it relates to a depositary for hire to the instant case, the writer of this opinion believes that when Johnson permitted cattle, placed in his care for the mutual benefit of himself as bailee and Gunderson as bailor, to run at large, contrary to state law, on a neighboring abandoned unfenced farm without first examining the contents of a granary (also unfenced) situated thereon, knowing that the door thereof had been destroyed; and the cattle ate the contents therein, consisting of poisoned molasses and bran, resulting in their death, he failed to exercise ordinary care and diligence, which is the care required of the bailee herein. The majority view of this court, however, is to the contrary, and the majority rules.

■ The majority emphasizes that the facts in this case do not establish either negligence or an absence of negligence as a matter of law. As this is a trial de novo, whether the bailee was negligent is a question of fact. In determining this question, custom is relevant as evidence.

"A common practice or custom is not permitted to be shown for the purpose of establishing that practice or custom as the standard upon the basis of which conduct is to be held negligent or not negligent, but merely as evidence for the assistance of the trier in determining whether the conduct of the person charged with negligence was in the particular situation that of a reasonably prudent person. Maynard v. Buck, 100 Mass. 40, 43; 2 Wigmore,

Evidence, 3d Ed., § 461. In such a case it may be admitted as 'evidence of what ought to be done, but what ought to be done is fixed by a standard of reasonable prudence, whether it usually is complied with or not.' Texas & Pacific Ry. Co. v. Behymer, 189 U.S. 468, 470, 23 S.Ct. 622, 623, 47 L.Ed. 905." Eamiello v. Piscitelli, 133 Conn. 360, 51 A.2d 912, at 915–916.

"* * * Whether the appropriate degree of diligence has been exercised must be determined as a question of fact from the circumstances of each particular case, such as the age, country, and actual state of society in which the bailee lives, the usages and customs of trade, the nature and value of the thing bailed, and its liability to loss or injury." 8 C.J.S. Bailments § 53 (1962).

"Evidence of general custom or usage ordinarily is admissible on the issue of due care where the conditions subsisting at the time and place of the accident are similar to those to which such custom relates." 65 C.J.S. Negligence § 232 (1950).

This court therefore concludes that where Johnson permitted cattle placed in his care for the mutual benefit of himself as bailee and Gunderson as bailor to run at large, according to the custom in the community, on a neighboring abandoned unfenced farm upon which was located a granary (the door of which had been destroyed nine years previously) and upon which cattle had grazed without injury since 1945; where bailor knew the cattle were running at large and did not insist that bailee keep the cattle within a fenced pasture; where bailee daily checked or observed the cattle while they were running at large, and the cattle died from eating poisoned molasses and bran mixture which, unknown to the bailee, was stored in the granary, bailee exercised ordinary care and diligence..

■ Notwithstanding this finding, we must pursue this case further, as it is Gunderson's contention that Johnson became an insurer in executing the bailment contract. He refers us to that portion of the contract which reads as follows:

"It is further understood and agreed by and between the Parties hereto that any loss by death from normal or ordinary causes shall be borne by the Party of the First Part."

He argues that, under the maxim "expressio unius est exclusio alterius," the expression in a contract of things of a class implies the exclusion of all not expressed. 17A C.J.S. Contracts § 312 (1963). Applying this maxim, he believes that the assumption by the bailor of all losses due to death from normal or ordinary causes excludes any assumption on the part of the bailor of losses due to deaths from abnormal or unordinary causes and consequently results in the assumption of the latter losses by the bailee. His view is that losses from deaths due to the consumption of poison, under the circumstances of this case, are losses due to abnormal or unordinary causes. No decisions of this court or of any other court applying this maxim to comparable facts are cited in support of this proposition.

"The maxim has been said to express a rule of construction, not of substantive law, and is not of universal application, but is applicable only where clearer indications for construction are wanting. It should not be used to create an ambiguity, or to contradict a clear expression of intent, or carried beyond the reasons for its creation. Thus, it may not be applied where an examination of the entire transaction indicates a different or more inclusive intention, or where there is some special reason for mentioning one thing and no special reason for mentioning a second thing, which is otherwise within the contract.

"The rule is generally given effect when a clause which sets out with particularity the subject matter that the parties have in mind is followed by a clause expressed in general terms, in which case the latter is generally controlled or restricted by the former, as discussed infra § 313." 17A C.J.S. Contracts § 312 (1963).

Our court, in construing a contract in a decision rendered in 1959, said:

"The object of construing a contract is to ascertain and give effect to the mutual intention of the parties as it existed at the time of contracting in so far as the same is ascertainable and lawful. Sec. 9-0703, NDRC 1943; Young v. Metcalf Land Co., 18 N.D. 441, 122 N.W. 1101; Baird v. Fuerst, 60 N.D. 592, 235 N.W. 594. The language of a contract governs its interpretation if the language is clear and explicit. Sec. 9-0702, NDRC 1943. A contract may be explained by reference to the circumstances under which it was made and the matter to which it relates. Sec. 9-0712, NDRC 1943; Baird v. Fuerst, supra." Ireland v. Charlesworth, N. D., 98 N.W.2d 224, at 231.

Applying those principles in analyzing the contract in the instant case, we conclude that the parties did not intend to make the bailee an insurer. The language of the contract clearly indicates that it was the intent of the parties that the bailor would assume all losses due to death from normal or ordinary causes. The contract did not attempt to decide the responsibility of the parties where losses were due to deaths from other causes. In analyzing the contract by reference to the circumstances under which it was made and the matter to which it relates, we note that the bailor sought out the bailee for the care of his cattle when his own facilities were inadequate and that the bailee did not advertise himself as an agister. The bailee's remuneration being merely

an equal share of the increase would make unlikely the assumption of an insurer's responsibility. Had the parties intended to make the bailee an insurer, they could have done so easily. We cannot apply the maxim to remake the contract.

A more reasonable interpretation of the entire contract is that the bailor assumed all losses due to deaths from normal and ordinary causes, and, as there was no provision therein relating to losses from other causes, that all other losses would be governed by the rules of bailment, consistent with the statutory rule of care required of a depositary or bailee for hire, which is ordinary care.

For reasons stated herein, the case is remanded with instructions to the trial court to enter judgment dismissing the complaint.

BURKE, C. J., and STRUTZ and TEIGEN, JJ., concur.

KNUDSON, J., did not participate.