PARK VIEW MANOR, INC., a North Dakota corporation, Plaintiff and Appellant,

v.

HOUSING AUTHORITY OF the COUNTY OF STUTSMAN, Jamestown, North Dakota, a Public Corporation, Defendant and Appellee.

Civ. No. 9627–A.

Supreme Court of North Dakota.

Nov. 21, 1980.

John Hjellum, of Hjellum, Weiss, Nerison, Jukkala & Wright, Jamestown, for plaintiff and appellant.

Charles J. Gilje, of Gilje, Greenwood & Dalsted, Jamestown, for defendant and appellee.

VANDE WALLE, Justice.

Park View Manor ("PVM") appeals from a judgment of the Stutsman County district court against PVM and in favor of the Stutsman County Housing Authority ("Authority") in the sum of $2,282.50 together with interest at a rate of six percent per annum. We affirm in part and reverse in part.

PVM and Authority entered into four lease agreements, on varying dates, in which PVM was the landlord and Authority was the tenant. The leases covered certain buildings which were to be used by the Authority for the purpose of sublease pursuant to Authority's leasing program of low-rent housing under Section 23 of the United States Housing Act of 1937, as amended. The first lease (hereinafter referred to as Lease No. 1) was executed on May 1, 1969. The other three leases were executed subsequent to that date. Lease No. 1 contained a provision for renewal for consecutive five-year periods and further provided:

"In the event the lease shall be renewed for any such five-year term, and in the event the real estate taxes on the leasehold premises or other costs of operation or maintenance on the part of Lessor have increased substantially since the beginning of the previous term, the parties agree to negotiate for a possible increase in the amount of rental for said renewal term to cover the cost to the Lessor of such increase in taxes, operation or maintenance, and any such rental increase subsequently agreed upon shall be made a part hereof by attaching a written memorandum thereof as an exhibit to this lease."

PVM and Authority became involved in litigation in which PVM was the plaintiff and Authority the defendant to determine whether or not the real estate taxes and other costs of operation and maintenance had increased "substantially." The other three leases contained no such provision and were not involved in the litigation. Prior to the trial of the first lawsuit between PVM and Authority the parties entered into a stipulation. The stipulation was intended to settle the differences between the parties as to the terms of Lease No. 1. The stipulation provided, in part:

"III.

" . . . Should real estate taxes for any year during the term of this lease commencing with 1975 exceed $15,064.18, the defendant [Authority] shall reimburse the plaintiff [PVM] for the excess above and beyond the $15,064.18 at the time as hereinafter specified. Should taxes for any

year during the term of the lease commencing with the tax year 1975 be less than said figure of $15,064.18, plaintiff shall reimburse defendant in the same manner for such difference.

"Any increase or decrease in real estate taxes shall be paid for or given credit to the lessee [Authority] respectively after the same has been ascertained on December 31 of the year in which the taxes are levied, and any increase or decrease will be adjusted in the monthly payment to be made by the lessee on February 1 following the increase or decrease.

## "IV.

"The defendant agrees to pay plaintiff an additional $2.00 per unit per month commencing October 1, 1973, to be deposited by plaintiff in an escrow account to be established with the Jamestown National Bank of Jamestown, North Dakota, in the names of 'Park View Manor, Inc., in the trust for The Housing Authority of the County of Stutsman.' Said escrow account is established for the sole purpose of assuring that funds for redecorating the interior of the units are available for use by the defendant in performing the decorating as needed. . . .

## "V.

"When the actual costs of operation and maintenance, as operation and maintenance are hereinafter defined, shall exceed in any one year $1,800.00, the defendant shall pay to the plaintiff the difference between the actual costs of operation and maintenance over and above said $1,800.00. The terms 'operation,' 'maintenance,' 'operation or maintenance,' or 'operation and maintenance' shall include actual costs of repairs necessitated by ordinary wear and tear. Said terms shall also include for purposes of this stipulation and the lease the actual costs of rental of water heaters.

"The terms shall exclude, without limitation, insurance, real estate taxes, special assessments, management expense, office expense (including officer person-

nel), structural repairs, and replacement of total units of fans, ranges, heating plants, and refrigerators. The terms shall further exclude repairs that are necessitated for reasons other than ordinary wear and tear of the building and repairs necessary for unusual, extraordinary, or unforeseen occurrences which do not destroy the building, but merely render it less suited for the use to which it was intended, which are paid for by insurance.

## "VI.

"The plaintiff and defendant shall meet for an annual accounting some time after October 1st of each year but no later than February 1st, and at that time it shall be determined whether the actual costs of operation and maintenance have exceeded $1,800.00, and it shall be determined whether or not real estate taxes have exceeded or not reached $15,064.18, and moneys will be exchanged between the parties according to the provisions hereinbefore contained.

"It is further agreed that the plaintiff each year, at or before the time of the annual accounting, shall present to the defendant a list of its actual expenditures for taxes and for operation and maintenance, with source documents as evidence required itemizing separately hours of labor and costs."

The stipulation did not meet its avowed purpose of settling the differences of opinion in interpretation of Lease No. 1. A subsequent action was commenced by PVM against Authority in which PVM alleged that for the period November 1, 1975, through September 30, 1976, its expenses had exceeded $1,800 and that the taxes had exceeded $15,064.18. It alleged the same for the expenses for the year October 1, 1976, to September 30, 1977, but PVM conceded that the taxes for the year 1977 had been reduced by $1,385.38.

In its complaint PVM added a second count concerning the three leases executed subsequent to Lease No. 1. With respect to those leases, PVM claimed moneys owing

from Authority because of an increase in taxes on property covered by those leases.

Authority answered the complaint by denying that the costs of operation and maintenance as defined in the stipulation exceeded $1,800 in either of the years ending September 30, 1976, or September 30, 1977. Authority asserted that PVM had failed to submit its list of expenses between October 1, 1976, and February 1, 1977, insofar as the October 1, 1975, through September 30, 1976, expenditures were concerned, and that PVM therefore was not entitled to an accounting for that period of time. Authority also alleged that the only money due anybody under the first count of the complaint (concerning Lease No. 1) was due to Authority in the amount of $1,385.38, the difference between the base figure of $15,-064.18 contained in the agreement and the actual tax of $13,678.80 paid by PVM for 1977 taxes. With respect to the other three leases, Authority in its answer alleged that PVM owed Authority $897.12 because of a decrease in taxes for 1977 and that although there had been increases in the taxes for 1975 and 1976 on the three subsequent leases, the notice of increase required by those leases had not been given by PVM to Authority, and PVM therefore could not recover these amounts. Those leases contained the following provisions:

"Monthly rental may be increased by the Lessor in an amount equal to any increase in municipal, county or state real estate taxes on the real property and improvements ... over and above the amount of such taxes assessed for the base year, ... The increase can only be increased upon written notice by the Lessor to the Lessee within sixty days prior to said anniversary date."

After trial to the court, the court determined that with regard to taxes on all four leases, PVM was entitled to payment from Authority in the sum of $1,565.72 for payments over the base tax rates and Authority was entitled to payment from PVM in the sum of $2,282.50 for payments under the base tax rates. With regard to Lease No. 1, in the payment for operation and maintenance, the court found that PVM had failed in its burden of proving that its actual costs of operation and maintenance exceeded in either of the two years the sum of $1,800.

PVM appealed to this court and Authority cross-appealed. We reversed the trial court's judgment and remanded it for the preparation of more adequate findings of fact or, if deemed necessary by the trial court, for a new trial. See *Park View Manor v. Housing Authority*, 287 N.W.2d 83 (N.D.1979). Following remand the trial court executed new findings of fact, conclusions of law, and order for judgment. Judgment was entered and PVM has again appealed that judgment to this court. In its findings, conclusions, and order for judgment following remand the trial court denied PVM reimbursement for costs of operation and maintenance and for the excess taxes and awarded judgment in the sum of $2,282.50 to Authority for the amount of taxes less than the base rate. PVM has listed three issues on appeal:

1. What do the "actual costs of operation and maintenance" include as defined in the stipulation?

2. Did PVM's "actual costs of operation and maintenance" exceed $1,800 for either the fiscal year ending September 30, 1976, or October 1, 1977, and, if so, in what amount?

3. Did the trial court err in failing to give PVM credit for excess of taxes for the years 1975 and 1976, and in failing to give PVM credit for the actual costs of operation or maintenance in excess of $1,800 because the claims were not filed within the time provided in the stipulation?

Before considering the issues raised on appeal by PVM we believe it necessary to set forth in full the findings and conclusions of the trial court pertinent to these items:

"1.

"That real estate taxes for the years 1975, 1976, [and] 1977 were subject to adjustment in accordance with the contract of the parties.

"2.

"That the plaintiff failed to timely present a request for an adjustment of taxes for the years 1975 and 1976 in accordance with the provisions of the contract, e. g., between October 1st and February 1st.

"3.

"That a timely claim for adjustment of taxes for the year 1977 was made by the defendant.

"4.

"That the plaintiff failed to file a timely request for adjustment of operation and maintenance costs for the fiscal year 10/1/75 to 10/1/76 as provided for in the contract.

"5.

"That the Plaintiff filed a timely request for adjustment of operation and maintenance costs for the fiscal years 10/1/76 to 10/1/77 as required by Paragraph VI of the Stipulation. (As set forth herein in paragraph 7 of the admitted facts.)

"6.

"That paragraph V of the stipulation of the parties (As set forth herein in paragraph 7 of the admitted facts) defines the reimbursable costs which the defendant will pay the plaintiff over and above $1,800.00.

"7.

"That the evidence presented by the plaintiff consisted of all bills paid by the plaintiff during the period of time in question.[1]

"CONCLUSIONS OF LAW

"Based on the foregoing, the Court makes the following conclusions of law:

1. As corrected by amended findings issued by the trial court on February 14, 1980.

"1.

"That the plaintiff failed to show any reason for its noncompliance with Paragraph VI of the stipulation with regard to the real estate taxes for 1975 and 1976, and for its claim for excess costs of operation for the fiscal year 10/1/75 to 10/1/76.

"2.

"That the presentation of the claims listed in Paragraph 1 above were made on an untimely basis and in violation of Paragraph VI of the stipulation, and are accordingly dismissed.

"3.

"That the adjustment of taxes for the year 1977 results in a reduction of taxes from $15,064.18 to $13,678.00 or a difference of $1,385.38 on one parcel of properties, and a reduction from $9,127.64 down to $8,230.52 or a difference of $897.12 for a total adjustment of $2,282.50 in defendant's favor.

"4.

"That Paragraph V of the Stipulation of the parties, when read in its entirety, contemplates reimbursement over the sum of $1,800.00 only for those repairs necessitated by ordinary wear plus the cost of the water heaters.

"5.

"That Paragraph V of the Stipulation excludes reimbursement for capital expenditures or negligent usage of items.

"6.

"That the Court admitted the various bills of the Plaintiff as business records only, with no ruling as to relevancy.

"7.

"That the evidence shows that virtually all exterior doors were replaced as well as an extremely high number of toilet seats. Such items constitute capital expenditures and are excluded from consideration under the contract.

"8.

"The Plaintiff failed to offer any explanation for the bills submitted in order to fit within the terms of the contract stipulation.

"9.

"The testimony of Neal [sic] Gallagher is nothing more than rank speculation which this Court concludes is of no value whatsoever. (See lines 9–24, page 28, trial transcript.) [2]

"10.

"That the plaintiff totally failed in the presentation of its proof in showing items of reimbursement in accordance with the stipulation."

▪ The construction of a written contract to determine its legal effect is always a question of law for the court to decide. *Tallackson Potato Co., Inc. v. MTK Potato Co.*, 278 N.W.2d 417 (N.D.1979). However, the interpretation of the parties' intentions as to the meaning of certain words or phrases in a written contract may involve either a question of law or a question of fact, depending upon whether or not the interpretation requires the use of extrinsic evidence. If the parties' intentions in a written contract can be ascertained from the writing alone, the interpretation of the contract is a question of law for the court to decide. *Metcalf v. Security Intern. Ins. Co.*, 261 N.W.2d 795 (N.D.1978).

▪ One of the major issues facing the trial court in this lawsuit was whether or not the bills introduced into evidence by PVM reflected costs for "operation" and "maintenance" as those terms were defined by the stipulation. In order to address that issue the trial court first had to determine whether or not the intention of the parties relative to the attempted definition of those terms could be ascertained from the provisions of the written stipulation without resort to the extrinsic evidence. N.D.C.C. Sec. 9–07–04. The trial court found that the parties' intentions were ascertainable with reference only to the written agreement, and as a conclusion of law the trial court's determination is fully reviewable by this court. *First Nat. Bank & Trust Co. of Bismarck v. Hart*, 267 N.W.2d 561 (N.D. 1978).

Paragraph V of the stipulation between the parties provides that "When the actual costs of operation and maintenance, as operation and maintenance are hereinafter defined," exceed $1,800 in any one year, Authority is to pay PVM the actual costs of operation and maintenance above $1,800.

▪ While PVM argues that the terms "operation" and "maintenance" include a broad array of items, those terms are not in themselves pivotal regarding who owes whom what in this lawsuit. We see a crucial term in this disputed stipulation as being the word "defined." This is the term chosen by the parties to the stipulation in

---

2. As corrected by the amended conclusions of law issued by the trial court on February 14, 1980, Frank Gallagher is the secretary-treasurer of PVM. The testimony to which the trial court refers reads:

"THE COURT: Sir, are you doing anything more than looking at those bills and reading what's on the bills? Are you adding anything to what's contained in the documents already?

"THE WITNESS: I can't.

"THE COURT: Well, then what are we doing this for? I don't understand. That evidence is already before me. I can read and unless he has some further information, I don't see the point of all this. I had suspected that he was going to tell us exactly what had happened in these situations but it seems to me what he is doing is just as much represented in the bill.

"We are not gaining anything by this testimony.

"MR. HJELLUM: I think that's true, Your Honor, except the source documents themselves show what it is and he is simply repeating what they say."

their effort to clarify certain obligations under that stipulation. We are bound to attribute to the word "defined" the meaning by which it is ordinarily and popularly understood. N.D.C.C. Sec. 9–07–09. Before any mention was made in the stipulation as to what was to be included and what was not to be included within the terms "operation" and "maintenance" the parties expressly revealed their intent to define those terms. In the Second College Edition of Webster's New World Dictionary, 1980, the term "define" is stated to mean: "1.*a*) to determine or set down the boundaries of *b*) to trace the precise outlines of; delineate. 2. to determine or state the extent and nature of; describe exactly [example]. 3.*a*) to give the distinguishing characteristics of *b*) to constitute the distinction of; differentiate [example]. 4. to state the meaning or meanings of . . ."

After expressing their intent to define the terms "operation" and "maintenance" in Paragraph V of the stipulation the parties agreed that "The terms 'operation', 'maintenance', 'operation or maintenance', or 'operation and maintenance' shall include actual costs of repairs necessitated by ordinary wear and tear. Said terms shall also include for purposes of this stipulation and the lease the actual costs of rental of water heaters." The parties did not stop here with their definitions but went on to add more to Paragraph V. However, it is important here to point out another statutory rule of construction in effect in North Dakota. Found at N.D.C.C. Section 9–07–06, that rule reads:

"The whole of a contract is to be taken so as to give effect to every part if reasonably practicable. Each clause is to help interpret the others."

With that rule of construction in mind we turn to the clause in the definition which follows the one relative to inclusions:

"The terms shall exclude, without limitation, insurance, real estate taxes, special assessments, management expense, office expense (including officer personnel), structural repairs, and replacement of total units of fans, ranges, heating plants, and refrigerators. The terms shall further exclude repairs that are necessitated for reasons other than ordinary wear and tear of the building and repairs necessary for unusual, extraordinary, or unforeseen occurrences which do not destroy the building, but merely render it less suited for the use to which it was intended, which are paid for by insurance.

Reading the inclusionary clause and the exclusionary clause together to be what the parties intended as their definition of the terms "operation" and "maintenance" we find a key phrase which sheds considerable light on the issue here. That phrase, "without limitation," is found in the exclusionary clause of the definition and clearly indicates that other unenumerated items of expense may fall outside the reach of "operation" and "maintenance" as defined by the parties. The phrase, in effect, leaves the door open for excluding expenses which, at the time the stipulation was entered into, were unforeseen. The significance of the phrase becomes obvious when its absence is discovered in the inclusionary clause. While the parties, by using the phrase "without limitation" in the exclusionary portion of the definition, agree that the list of excluded items was not intended to be exhaustive, the absence of the same phrase in the inclusionary portion indicates no such lack of intent as to the enumerated items appearing therein.

This court, while utilizing the statutory rules of construction referred to earlier, has recognized the availability of the maxim *expressio unius est exclusio alterius. Gunderson v. Johnson*, 132 N.W.2d 700 (N.D.1965). This rule of construction, although more frequently applied in the construction of statutes, is also applicable to the construction of contracts. *Goebel v. First Federal S. & L. Assn. of Racine*, 83 Wis.2d 668, 266 N.W.2d 352 (1978). The maxim states the proposition that an expression in a contract of one or more things of a class implies exclusion of all things not expressed, even though all would have been implied had none been expressed. 17A C.J.S. *Contracts* § 312. This rule of con-

struction is not to be used to contradict a clear expression of intent. *Marcolini v. Allstate Insurance Company*, 160 Conn. 280, 278 A.2d 796, 65 A.L.R.3d 846 (1971). However, when such an expression of intent is apparent as to one portion of the agreement the rule may be extremely useful in determining the intent of the parties as to a related portion. We have already determined that the parties involved in this case expressly revealed their intention to define the terms "operation" and "maintenance" in the stipulation. We have examined the meaning of the term "define" as it is ordinarily understood. Later in the document this intent to define is reflected in the inclusionary and exclusionary clauses regarding the terms "operation" and "maintenance." This definition contained words of inclusion and words of exclusion coupled with words of limitation. Applying the maxim *expressio unius est exclusio alterius* to these conditions leads us to the conclusion that the inclusionary clause of the definition was intended by the parties to reflect a close class of items of expense and to exclude all expenses which were not of the nature of those expressly stated.

It is apparent that the terms "operation" and "maintenance" as defined in the stipulation do not have the same meaning as might be ascribed to those terms if there were no definition in the stipulation. Therefore, the cases cited by PVM construing those terms have no significance to the issue before us. PVM is bound by the definition of those terms as set forth in the stipulation. By that definition, expenses necessitated for reasons other than ordinary wear and tear of the building and repairs necessary for unusual, extraordinary, and unforeseen occurrences are excluded from the terms "operation" and "maintenance" and PVM is entitled to no compensation for those expenses under this provision of the lease, as amended by the stipulation. Put another way, PVM was entitled only to reimbursement for items of expense which it could fit into either the category of "repairs necessitated by ordinary wear and tear" or the category of "rental of water heaters."

After the trial court had construed the stipulation to provide that PVM was to be reimbursed only for items over $1,800 for repairs necessitated by ordinary wear and tear or actual costs of rental of water heaters, it faced the next question: a determination of whether or not particular items of expense for which PVM sought reimbursement fit into either of those two categories.

The trial court addressed two issues raised by PVM in regard to what amounts of reimbursement PVM was entitled to for costs of operation and maintenance. PVM raises those same two issues on this appeal. First, it asks whether or not actual costs of operation and maintenance exceeded $1,800 for the fiscal year ending September 30, 1976, and, if so, to what extent. Second, it asks the same question regarding the fiscal year ending September 30, 1977. As to the fiscal year ending September 30, 1976, the trial court concluded that PVM had presented its claims to Authority on an untimely basis in conflict with Paragraph VI of the stipulation and the court therefore dismissed the claims for reimbursement for that year.

Paragraph VI of the stipulation required the parties to meet sometime after October 1 of each year and sometime before February 1 for an annual accounting for the purpose of determining actual costs of operation and maintenance and the amount of real estate taxes owed.

Paragraph VI further provided that before each annual accounting PVM was to submit to Authority a list of its actual expenditures for operation and maintenance and for taxes. Along with this list, PVM was to provide to Authority source documents relative to the expenditures.

The trial court concluded that the references to the February 1 deadline in the stipulation required strict enforcement regarding PVM's obligations under Paragraph VI and that such enforcement would not conflict with N.D.C.C. Section 9–07–23. That section states:

"Time is of the essence of a contract if it is provided expressly by the terms of

the contract or if such was the intention of the parties as disclosed thereby."

Long ago, this court spelled out the meaning of a statutory provision such as N.D.C.C. Section 9–07–23. The predecessor of N.D.C.C. Section 9–07–23 was Section 5918, Compiled Laws of 1913. In *Sunshine Cloak & Suit Co. v. Roquette Bros.*, 30 N.D. 143, 152 N.W. 359 (1915), this court held that while Section 5918, Compiled Laws of 1913, stated that time is never considered as of the essence of the contract unless it is so provided by the terms of the contract, ". . . still it is not necessary to declare in so many words 'that time is of the essence of the contract,' but it is sufficient if it appears that it was the intention of the parties thereto that time should be of the essence thereof." 30 N.D. at 149, 152 N.W. at 361.

In *Sunshine, supra*, this court went on to quote *Standard Lumber Co. v. Miller & Vidor Lumber Co.*, 21 Okl. 617, 96 P. 761 (1908), wherein the Supreme Court of Oklahoma, in considering a provision in the Codes of that State similar to Section 5918, Compiled Laws of 1913, said:

"It was clearly not the intention in the adoption of such a statutory provision as this to require the identical language of the statute to be inserted in a contract before time could become the essence thereof. Code provisions have ever been adopted for the purpose of abolishing technicalities and applying substantial justice, and it necessarily follows that, where it appears by the language expressed in a contract, regardless of the phraseology or the form of expression used, that it was the intention of the parties thereto that time should be the essence of the contract, that should be the construction in law. Of course, in making a proper construction, a court will be confined to what is expressed in the contract, and will be precluded from going outside of the same and considering contemporaneous and extraneous matters." 21 Okl. at 626, 96 P. at 765.

Later in *Sunshine, supra*, 30 N.D. at 151, 152 N.W. at 362, this court quoted *Mechem on Sales*, § 1138:

"Where the time for the performance is thus fixed, it is, in the language of the law, deemed usually to be 'of the essence of the contract,' and, unless waived by the other party, performance at the time stipulated is indispensable. It is not necessary that it shall be so declared in express terms; it is enough if it is a term of the contract."

Whether or not, and to what extent, costs of operation and maintenance, as defined by the stipulation, exceeded $1,800 for the fiscal year ending September 30, 1976, were contingent matters that could be determined only through negotiations between PVM and Authority officials. The two parties agreed to meet in order that these determinations could be made. Authority could have no idea whether it would have to reimburse PVM a substantial amount, a small amount, or any amount at all until it had an opportunity to negotiate this matter with PVM. The parties used clear language in setting down the time limits in Paragraph VI:

"The plaintiff [PVM] and defendant [Authority] shall meet for an annual accounting some time after October 1st of each year *but no later than February 1st,* and at that time it shall be determined whether the actual costs of operation and maintenance have exceeded $1,800.00, . . . and moneys will be exchanged between the parties according to the provisions hereinbefore contained." [Emphasis supplied.]

■ PVM had more than a reasonable amount of time to compile and present to Authority the source documents it expected to rely upon to show that operation and maintenance costs had exceeded $1,800. Authority was not obligated, by the terms of the stipulation, to meet with PVM on this matter until PVM provided Authority with those source documents. We believe that the wording of the stipulation clearly points out that the parties intended that February 1 of each year would be the outside time limit on Authority's liability for reimbursement of costs of operation and maintenance in excess of $1,800. Put an-

other way, the language used brought the agreement within the reach of N.D.C.C. Section 9–07–23 and the trial court was correct in dismissing PVM's claims for reimbursement for costs of operation or maintenance in excess of $1,800 for the fiscal year ending September 30, 1976.

As to whether or not Authority was to reimburse PVM for costs of operation and maintenance over $1,800 for the fiscal year ending September 30, 1977, the trial court concluded that, while PVM had complied with the time-limit requirements of Paragraph VI, PVM had failed in its presentation of proof to show that the items for which it sought reimbursement fell within the scope of the reimbursable items as defined in the stipulation. This court's position in reviewing cases tried without a jury is that the findings of the trial court are presumably correct and will not be disturbed unless shown to be clearly erroneous. Rule 52(a), N.D.R.Civ.P.

PVM contends that the transcript of the trial clearly reflects that each item of expense for which it sought reimbursement falls squarely within the realm of operation and maintenance. However, what PVM fails to consider in its arguments is that it agreed to a definition of the terms "operation" and "maintenance" which is considerably more restrictive than the one normally assigned to those terms. If the stipulation had not attempted to define those terms but had used them in the manner in which they are usually understood, PVM would have a far stronger argument. However, the trial transcript reveals the following testimony of Frank Gallagher, secretary-treasurer of PVM, is indicative of the type of testimony PVM relied upon to prove its claims regarding costs of operation or maintenance for the fiscal year ending September 30, 1976:

"THE COURT: All right, you may continue, Mr. Hjellum, and let's not go through each individual item. If this gentleman has some information to add to what's already contained thereon, otherwise perhaps you can limit to general questions.

"BY MR. HJELLUM:

"Q. With reference to all of the items of Alvar Lindberg are those items which he has the repair and maintenance performed and for which you were charged?

"A. I assume so. The bills were sent to us and we paid them in that light.

"Q. And they were marked as such on your ledger, were they not?

"A. Yes.

"Q. Now, I notice that there is an item with reference to the Traiser Electric Company. We will leave those until I call Mr. Traiser. You have the same item of fifty dollars per month for repairs and maintenance here to the Stutsman County Housing Authority, do you not?

"A. Yes.

"Q. And they're listed each month, are they not?

"A. Yes.

"Q. Are all other items operation and maintenance of 11–1?

"A. They are, yes."

PVM's other witness, James Traiser, PVM's president, also testified as to what he believed to be the actual costs of operation and maintenance. A review of his testimony reveals that it centers on items of replacement rather than items of repair. These items include the replacement of 41 storm doors during the time period in question. While this would not necessarily keep the items outside the reach of "operation and maintenance" as it is commonly understood, he like Mr. Gallagher, offered no evidence other than his personal opinion that these items fell within the definition of "operation and maintenance" as it is found in the stipulation. The opinions of these two witnesses as to what items were to be included in the terms "operation" and "maintenance" had no probative value whatsoever. We have already determined that the construction of the stipulation was a question of law. The trial court found that Mr. Gallagher's testimony amounted to nothing more than rank speculation and that it was of no value. In stating this determination in its conclusions

of law, the trial court made reference to a portion of Gallagher's testimony found in the trial transcript. Upon review we find that the portion of Gallagher's testimony referred to by the trial court was relative to the items of expense for operation and maintenance for the fiscal year ending September 30, 1976, rather than for the period ending September 30, 1977. However, upon further review, we find no difference in the nature of Gallagher's testimony regarding the same types of costs for the fiscal year ending September 30, 1977.

■ The issue of whether or not PVM had met its burden of proof regarding costs for which it was entitled to reimbursement for the fiscal year ending September 30, 1977, was previously before us. See *Park View Manor v. Housing Authority, Etc., supra.* That case was remanded for the preparation of more adequate findings of fact or, if deemed necessary by the trial court, for a new trial. The trial court judge revised his earlier findings. In its earlier findings of fact the trial court had found that "... [PVM] has failed in its burden of proving that its actual costs of operation and maintenance for the fiscal years ending September 30, 1976, and September 30, 1977, exceeded in either year $1,800.00."[3] On remand, the revised findings of fact contained no statement as to whether or not PVM had met its burden. As to the issue of costs of operation and maintenance for the period in question the findings of fact simply stated:

"That the evidence presented by the plaintiff [PVM] consisted of all bills paid

by the plaintiff during the period of time in question."

However, the revised conclusions of law, at paragraphs 5, 6, 7, 8, 9, and 10, contain six statements regarding this issue. Essentially, these six statements reflected that PVM, while having presented proof of costs, failed to demonstrate to the court that these costs were reimbursable pursuant to the stipulation.[4]

■ Upon reviewing the findings of fact in accordance with our interpretation of the legal effect of the stipulation entered into by the parties, we affirm the trial court's legal conclusion that PVM had failed in the presentation of its proof in showing that items of reimbursement for the fiscal year ending September 30, 1977, fell within the boundaries of the stipulation.

The last issue to be addressed is whether or not PVM should be credited for certain portions of annual real estate taxes which it paid. The parties involved had agreed that Authority would pay to PVM any amount of annual real estate taxes which exceeded $15,064.18 as to Lease No. 1 and $9,127.64 as to the subsequent leases. [Money would change hands in the opposite manner in the event the taxes fell below these base amounts.] The parties had further agreed that the amount in excess of the base figures would be due from Authority to PVM upon timely submission of the claims from PVM. PVM failed to comply with the agreed-upon deadlines. Originally, regarding PVM's noncompliance with this agreement, the trial court had concluded in its memorandum decision:

**3.** On remand, the trial court stated in its conclusions of law that the reason that PVM was not entitled to reimbursement for the year ending September 30, 1976, was that it had failed to comply with the time requirements of Paragraph VI of the stipulation.

**4.** Although it has not been raised as an issue on this appeal, the labeling of findings of fact and conclusions of law has previously been considered by this court. See *Butts Feed Lots, Inc. v. Board of Cty. Commissioners,* 261 N.W.2d 667 (N.D.1977). In *Butts,* we concluded that in the determination of whether a trial court's finding is one of fact or of law, the label placed thereon is not conclusive. In analyzing find-

ings of fact and conclusions of law, this court will look to the substance rather than to the labels given them by the trial court. *Hamilton v. Winter,* 281 N.W.2d 54 (N.D.1979). It is true that findings of fact and conclusions of law should be stated with sufficient specificity to assist this court and afford it a clear understanding of the trial court's decision. N.D.R. Civ.P. Rule 52; *Fine v. Fine,* 248 N.W.2d 838 (N.D.1976). However, when this court understands from the findings the factual basis for the trial court's determination, the findings are adequately specified. *Rummel v. Rummel,* 234 N.W.2d 848 (N.D.1975).

"No harm can be shown to come to either side nor is any penalty built into the contract."

On this basis the trial court credited the overpayments for real estate taxes made by PVM for 1975 and 1976 against the amount due from PVM to Authority when the taxes fell below the base amounts for 1977.

On appeal, this court found that the reasoning relied upon by the trial court judge was not, standing alone, sufficient to, in effect, rewrite the timetable portions of the contract. See *Park View Manor v. Housing Authority, Etc.*, *supra*, 287 N.W.2d at 86. On remand, the trial court reversed itself on this issue and in doing so used the same basis for disallowing PVM's tax-reimbursement claims as it had used for disallowing PVM's claims for reimbursement of operation and maintenance costs for the year ending September 30, 1976. That is, the trial court found that PVM's claims for tax reimbursement should fail because they were not submitted to Authority in compliance with the timetable for submitting such claims, as had been agreed upon by the parties. We cannot agree with the trial court that PVM's tax reimbursement claims should be treated the same as PVM's claims for reimbursement regarding operation and maintenance costs. We have already concluded that as to the timely submission of claims for reimbursement of costs of operation and maintenance, time was of the essence to the contract. However, the nature of the debt regarding the tax payments differs significantly from that regarding costs of operation and maintenance. Unlike the amount represented by the costs of operation and maintenance, the amount of taxes every year on each parcel of property could not be in dispute. Whether or not Authority would owe PVM for any excess in real estate taxes above the base amounts was not a matter subject to negotiations between the parties. The amounts of the taxes were certain and easily ascertainable by either party. The fact that the parties agreed that the determination regarding taxes as to one parcel of property would be made at the same annual accounting meeting as the determination of costs of opera-

tion and maintenance is not, in itself, controlling. That portion of the agreement merely reflected the fact that the annual accounting regarding operation and maintenance was a convenient time for taking care of any real estate tax amount changes. If the parties intend that a debt shall be absolute, and fix upon a future event merely as a convenient time for payment, the debt shall not be contingent. *St. Alexius Hospital v. Eckert*, 284 N.W.2d 441 (N.D. 1979). As to the other lease agreements, it stated that PVM was to notify Authority of the increase 60 days prior to the anniversary date of the lease. However, here again, the amount of the debt was not a subject of negotiation and was just as easily ascertainable by Authority as it was by PVM. Furthermore, we find nothing in those agreements that would reflect the parties' intention to make time of the essence pursuant to N.D.C.C. Section 9–07–23.

The portion of the judgment determining that PVM should not be allowed reimbursement for costs of operation and maintenance for the fiscal years ending September 30, 1976, and September 30, 1977, is affirmed. The portion of the judgment determining that PVM should not be credited for excess taxes paid for the years 1975 and 1976 is reversed.

The case is remanded for modification of the judgment for the reasons stated in this opinion. No costs are allowed to either party.

ERICKSTAD, C. J., and PEDERSON, PAULSON and SAND, JJ., concur.