DECISION
This matter is before the Court for decision following a bench trial. The Plaintiff, Peter D. Pritsker, Inc., d/b/a Providence Diamond Company ("Diamond" or "Plaintiff"), alleges that the Defendant, Gateway Woodside, Inc. ("Gateway"), breached the exclusivity provision contained in the Standard Commercial Lease ("1997 Lease") entered into between Diamond and Gateway by leasing space within the Garden City Shopping Center ("Center") to a store, other than Diamond, whose primary purpose is the retail sale of fine jewelry.[1] Further, Diamond claims that because Gateway failed to cure the breach within thirty days of its receipt of written notification of the violation and, to date, has failed to cure the breach, Diamond is entitled to the remedy specified in *Page 2 
paragraph 44 of the 1997 Lease.[2] In particular, pursuant to paragraph 44 of the 1997 Lease, Diamond seeks reimbursement for fifty percent (50%) of the Fixed Minimum Rent it paid to Gateway from December 2004[3] through September 30, 2008 — totaling $318,391.80 — plus any additional overpayments that have been made since September 30, 2008 and through the date of the entry of judgment. Diamond also claims that it is entitled to a declaration that, going forward and until Gateway remedies the alleged violation, Diamond's monthly Fixed Minimum Rent payments be reduced by half. Finally, Diamond seeks an award of statutory interest on any overpayments it has made to Gateway and the costs of suit, including reasonable attorneys' fees. In response, Gateway argues that it did not violate the exclusivity provision contained in the 1997 Lease because it did not lease space in the Center to a store — specifically, PWH — whose primary purpose is the retail sale of fine jewelry.
 I Facts and Travel
This dispute revolves around the determination of whether an exclusivity provision contained in a commercial lease has been violated. Against this backdrop, the pertinent facts giving rise to the instant matter are presented herein. Diamond is a family-owned business that operates a high-end fine jewelry store in the Center. In addition to selling jewelry items such as diamonds, necklaces, bracelets, earrings, pins, broaches, etc., Diamond also is an authorized retail dealer of two brands of watches — Rolex and *Page 3 
David Yurman. Diamond also sells a number of specialty gift items, such as Swarovski crystal, and certain accessories, such as watch winders.
Diamond occupies the premises designated as 65 Hillside Road, Cranston, Rhode Island pursuant to a document entitled "Standard Commercial Lease" dated January 16, 1997 — i.e., the 1997 Lease — by and between The Flatley Company ("Flatley") and Diamond. (Trial Ex. 1.) Gateway is the current owner of the Center and is the successor in interest to Flatley with respect to the 1997 Lease. PWH[4] also operates a store in the Center and occupies its premises pursuant to the PWH Lease.[5] (Trial Ex. 2.)
Prior to the 1997 Lease, Diamond had been a tenant in the Center pursuant to an earlier lease. In January of 1997, Diamond agreed to terminate that lease, take over additional space in the Center, commit to a longer lease term, and pay a higher rent per square foot in consideration of exclusive rights granted in the 1997 Lease. The exclusive — which is found in paragraph 44 of the 1997 Lease — provides that Diamond shall be the only store located in the Center whose "primary purpose is the retail sale of fine jewelry." (Trial Ex. 1, ¶ 44.) The 1997 Lease provided for a term of ten years, plus one five-year extension at the tenant's option — which Diamond has since exercised.[6] Id. ¶ 2(a).
Regarding the specific terms of the 1997 Lease, paragraph 7(a) defines the permitted use of the premises by Diamond: *Page 4 
 For the sale and repair at retail of fine jewelry including but not limited to rings, chains, bracelets, watches, necklaces, earrings, precious stones, as well as other jewelry products. TENANT [i.e., Providence Diamond] may also sell china, crystal, flatware, and other fine gift items usually found in jewelry stores, and for no other purpose. Id. ¶ 7(a).
Further, paragraph 44 of the 1997 Lease provides in part, "LANDLORD covenants that following the execution of this Lease and continuing for the term of this Lease, LANDLORD will not lease space within the Center to a store whose primary purpose is the retail sale of finejewelry." Id. ¶ 44 (emphasis added.) Paragraph 44 of the 1997 Lease also contains a "safe harbor" provision for the Landlord providing that, "The incidental sale by a future retailer of fine jewelry items shall not be deemed a violation hereof. As used herein, `incidental sale' shall mean that fine jewelry products do not exceed twenty percent (20%) of the display area within the premises." Id. ¶ 44. The "safe harbor" provision is not a limitation on Diamond's exclusive but, rather, was intended as protection for the Landlord. In particular, the provision was presumably designed to permit the Landlord to lease space in the Center to department stores that maintain a fine jewelry counter or department without violating the exclusive. Finally, paragraph 44 of the 1997 Lease also specifies:
 If at any time during the original term or the option to extend of this Lease, a future retailer does operate a fine jewelry store within the Center as determined and qualified at TENANT'S sole expense with LANDLORD'S acceptance thereof, except for the incidental sale by a future retailer of fine jewelry items or any existing tenant with the sale of fine jewelry as an existing permitted use [] within the Center, and LANDLORD does not cure said violation within thirty (30) days of LANDLORD'S receipt of TENANT'S written notification of said violation sent certified or registered mail, then, in addition to any other remedies at law or in equity to which TENANT may be entitled, the Fixed Minimum Rent shall be reduced to fifty *Page 5 
percent (50%) of the then in effect Fixed Minimum Rent effective with the first day following the expiration of the thirty (30) day period and continuing until such time as such fine jewelry store except for the incidental sale by a future retailer of fine jewelry items or any existing tenant with the sale of fine jewelry [as] an existing permitted use within the Center continues to operate in violation or occupy a premises in the Center. Id. ¶ 44.
In April of 2004, representatives of Gateway met with representatives of PWH to discuss PWH's interest in relocating its Reservoir Avenue, Cranston store to the Center. PWH's President entered into discussions with General Growth Properties, Inc., the leasing and management agent for Gateway, regarding space possibilities in the Center. Two different locations were available, but a location in the "Commons" area soon became the focus of the dialogue. Subsequently, on August 27, 2004, following months of negotiations, Gateway and PWH signed the PWH Lease, pursuant to which Gateway leased 3497 square feet of space in the Center to PWH. (Trial Ex. 2, § 2.1.)
Sections 1.1(h) and 10.1, and Exhibits B and C of the PWH Lease list certain use restrictions and exclusives that set forth the permitted use that may be made of space within its premises by PWH. To illustrate, the PWH Lease requires PWH to use its premises:
 Only as a first-class, high-quality retail store principally and primarily for the retail sale of watches and related watch accessories, as well as the offering of watch repair services, provided that a minimum of sixty-five percent (65%) of the floor area of the demised premise[s] shall be devoted to retail sales. The demised premises shall be used for no other purpose or purposes. Id. § 1.1(h).
The PWH Lease also states, "It is understood, and the Tenant so agrees, that the demised premises during the term of this lease shall be used and occupied by the Tenant only for the purposes specified as the use thereof in Section 1.1(h) of this lease, and for *Page 6 
no other purpose or purposes." Id. § 10.1. In addition, Exhibit B to the PWH Lease, entitled "Construction," provides in part:
 Tenant's Work shall be performed in a first-class manner and shall be at least comparable to the quality and level of that in Tenant's downtown Providence location. Tenant's Work shall include, but not be limited to . . . (c) the placement of Tenant's typical jewelry cases for watches/accessories in the front of the demised premises with Tenant's repair service area located in the rear portion of the demised premises. Id. Ex. B, B-2.
Exhibit C to the PWH Lease, entitled "List of Existing Use Restrictions and Exclusives," states:
 Tenant agrees, as set forth in Section 10.1, that none of the following enumerated items ever shall be sold or displayed in or from the demised premises (except in such limited areas and/or amounts as are set forth as being permitted): . . .
 PROVIDENCE DIAMOND EXCLUSIVE
 Provided TENANT is operating a Providence Diamond Company in the Center, LANDLORD covenants that following the execution date of this Lease and continuing for the term of this Lease, LANDLORD will not lease space within the Center to a store whose primary purpose is the retail sale of fine jewelry.
 The incidental sale by a future retailer of fine jewelry items shall not be deemed a violation hereof. As used herein, "incidental sale" shall mean that fine jewelry products do not exceed twenty percent (20%) of the display area within the premises. Id. Ex. C, C-1, C-7.
After entering into the lease, PWH retained a design firm and contractor to construct and improve the interior of the space. The design — which was approved by Gateway — called for a division of the space into three approximately equal sections. The first one third, located in the front of the store, consists of showroom space for watches, *Page 7 
watch bands, and accessories, along with a technical service desk. The middle one third of the store is dedicated to major watch repair work. This area, while physically separated from the front space, is visually integrated into the retail section through the use of large windows. Lastly, the rear one third of the store is designated for administrative and office space.
In or about October 2004, PWH officially opened its retail store in the Center and began conducting business pursuant to the terms of the PWH Lease. Since opening, PWH's store in the Center has advertised, displayed, and sold watches at retail. In addition, PWH also serves as a designated watch repair and service center for a wide variety of watch brands. PWH's complete inventory of retail goods consists of watches, watch bands, batteries, and watch accessories — such as watch winders.
Shortly after PWH opened its store in the Center, Gateway received written notification from Diamond regarding PWH's then current business operations. (Trial Ex. 3.) Specifically, by letter dated November 9, 2004, Diamond contends that PWH is engaged primarily in the retail sale of fine jewelry and devotes in excess of twenty percent (20%) of the store's display area to watches that are considered to be articles of fine jewelry. Id. Further, Diamond maintains that Gateway violated the exclusivity provision contained in paragraph 44 of the 1997 Lease by leasing space within the Center to another store — PWH — whose primary purpose is the retail sale of fine jewelry. Id. In response to Diamond's complaints, Gateway conducted an investigation, and by letter dated November 18, 2004, advised Diamond that, in Gateway's opinion, it did not violate the exclusivity provision by leasing space in the Center to PWH because the primary purpose of PWH's store in the Center is not the retail sale of fine jewelry. (Trial Ex. 4.) *Page 8 
Gateway further advised Diamond that "any [subsequent] failure to pay rent at the levels provided in paragraph 4 of the [1997] Lease shall constitute a default under [the] Lease. . . ." Id. After failing to reach an amicable resolution through negotiation, on December 22, 2004, Diamond filed this suit.
 II Standards of Review A Non-Jury Trials
It is axiomatic that Diamond has the burden of satisfying the Court by a preponderance of the evidence as to all of the claims presented in the instant matter. See Ducharme v. Champagne, 292 A.2d 224, 226 (R.I. 1972) ("[T]he long-standing rule in this state [is] that the burden of proof is on [the party] who asserts a claim, whether in law or equity") (citing Donnelly v. Donnelly Bros., Inc., 191 A.2d 143, 147 (R.I. 1963)); Woodward v. United Transit Co., 181 A.2d 622, 624 (R.I. 1962) ("[A] defendant is under no obligation to disprove that which the plaintiffs . . . assert or claim; rather the plaintiffs must prove that which they assert or claim"); see also Botelho v. Caster's Inc.,970 A.2d 541, 547 n. 3 (R.I. 2009) ("[T]his is a civil action, and under our law, the plaintiff bears the burden of proving each of the case elements by a preponderance of the evidence * * *.") In a non-jury trial, the standard of review is governed by Super. R. Civ. P. 52(a). The Rule provides that "in all actions tried upon the facts without a jury . . . the court shall find the facts specifically and state separately its conclusions of law thereon. . . ." Super. R. Civ. P. 52(a). Accordingly, in a bench trial "the trial justice sits as the trier of fact as well as of law." Hood v. Hawkins, 478 A.2d 181, 184 (R.I. 1984). *Page 9 
When rendering a decision in a non-jury trial, either upon full findings or upon a party's motion for judgment on partial findings under Super. R. Civ. P. 52(c), the trial justice "[N]eed not engage in extensive analysis and discussion of all the evidence." Cathay Cathay,Inc. v. Vindalu, LLC, 962 A.2d 740, 747 (R.I. 2009) (quotingDonnelly v. Cowsill, 716 A.2d 742, 747 (R.I. 1998)). Rather, "[B]rief findings and conclusions are sufficient if they address and resolve the controlling and essential factual issues of the case." Id. (quotingDonnelly, 716 A.2d at 747). However, after reviewing the evidence, the trial justice must "find the facts specifically and state separately its conclusions of law thereon." Super. R. Civ. P. 52(a); see also CathayCathay, Inc., 962 A.2d at 747 ("Rule 52(c), in conjunction with Rule 52(a), requires that in a trial without a jury, any judgment entered as a matter of law be supported by facts found specially and conclusions of law stated separately.").
 B Restrictive Covenants
There are two basic types of restrictive covenants normally found in shopping center leases: those restricting "types" of businesses and those restricting the sale of either designated items or designated classes of items. Almacs Inc. v. Drogin, 771 F.Supp 506, 510 (D.R.I. 1991); see also 97 A.L.R. 2d at 13. The restrictive covenant in the 1997 Lease is the first type, for it restricts the landlord from leasing space within the Center to a certain type of competing business — a store whose primary purpose is the retail sale of fine jewelry.See 97 A.L.R. 2d at 14. In Rhode Island, restrictive covenants in leases are governed by the same rules as covenants generally. Iggy's Doughboys,Inc. v. Giroux, 729 A.2d 701, 706 (R.I. 1999); see also Almacs,771 F.Supp at 509. Nevertheless, because restrictive covenants and exclusivity provisions in commercial *Page 10 
leases are not favored by the law, such provisions will be "strictly construed in favor of the free alienability of land while still respecting the purposes for which the restriction was established.Almacs Inc., 771 F.Supp at 509 (quoting Lancellotti v. Lancellotti,481 A.2d 7, 10 (R.I. 1984)); see also Iggy's Doughboys, Inc.,729 A.2d at 706; Gregory v. State Department of Mental Health, Retardation andHospitals, 495 A.2d 997, 1000 (R.I. 1985). Moreover, restrictive covenants and exclusivity provisions are enforceable only if the terms are reasonable in light of the circumstances surrounding the agreement and do not extend beyond what is necessary to protect the beneficiary.Iggy's Doughboys, Inc., 729 A.2d at 706; see also Durapin, Inc. v.American Products, Inc., 559 A.2d 1051 (R.I. 1989) (interpreting a non-competition restrictive covenant). A commercial tenant trying to enforce an exclusivity restriction in a lease must show that the activity which allegedly infringes on its exclusivity provision falls clearly within the specific terms of the covenant. See Iggy's Doughboys,Inc., 729 A.2d at 706. Accordingly, the exclusivity provision at issue in this case must be read narrowly and construed against Diamond in order to provide only what is truly necessary to protect Diamond's interest in being the sole "fine jeweler" in the Center.
 III Discussion
This dispute essentially rests upon the determination of whether Gateway violated Diamond's exclusive contained in the 1997 Lease by leasing space in the Center to a store, other than Diamond, whose primary purpose is the retail sale of fine jewelry. In order to answer this question, however, there are a number of issues that must first be addressed. *Page 11 
 A Classification of Watches as "Fine Jewelry"
With regard to the instant matter, a threshold issue is the determination of whether watches can be considered a category of "fine jewelry." To answer this question, the Court looks to the express language contained in the 1997 Lease for guidance. In particular, paragraph 7(a) of the 1997 Lease specifies that Diamond is to use its premises solely "For the sale and repair at retail of fine jewelry
including but not limited to rings, chains, bracelets,watches, necklaces, earrings, precious stones, as well as other jewelry products." (Trial Ex. 1, ¶ 7(a)) (emphasis added.) This provision makes it clear that, within the meaning of the 1997 Lease, watchescan be considered a category of "fine jewelry." See Friedman onLeases, § 26:2, pp. 26-3 — 26-4 (5th ed. 2008) ("Express definitions of words and phrases, as used in a lease, govern their interpretation"); see also Park View Manor, Inc. v. Hous. Auth., 300 N.W.2d 218, 224-26 (N.D. 1980). Further, in the exclusive located in paragraph 44 of the 1997 Lease, Gateway is prohibited from "leasing space within the Center to a store whose primary purpose is the retail sale of fine jewelry." (Trial Ex. 1, ¶ 44.) Thus, in accordance with paragraph 7(a) of the 1997 Lease, the term "fine jewelry" referred to in paragraph 44 should also be interpreted as to include watches as a category. See Friedman on Leases, § 26:5.8, p. 26-47 (5th
ed. 2008) ("Words used in one sense in one part of a lease are deemed to have been used in the same sense in another part. . . ."); see alsoBlair v. Barron, 539 P.2d 578, 582 (1975).[7] *Page 12 
 B Defining "Fine Jewelry"
While paragraph 7(a) of the 1997 Lease does present a list of items that can be categorized as articles of "fine jewelry" — including watches — the lease does not provide a specific definition of the term "fine jewelry." Thus, in order to fill this definitional void and settle any potential uncertainty regarding the precise meaning of the term "fine jewelry," the Court must first attempt to read the 1997 Lease "in its entirety, giving [`fine jewelry'] [its] plain, ordinary, and usual meaning." Irene Realty Corp. v. Travelers Property Casualty Co. ofAmerica, No. 2008-147-Appeal, 2009 WL 1576517, at *4 (R.I. 2009) (quoting Mallane v. Holyoke Mutual Insurance Co. of Salem, 658 A.2d 18,20 (R.I. 1995)); see also Cathay Cathay, Inc., 962 A.2d at 746;Sturbridge Home Builders, Inc. v. Downing Seaport, Inc., 890 A.2d 58,62-63 (R.I. 2005); Cerilli v. Newport Offshore, Ltd., 612 A.2d 35, 37-38
(R.I. 1992) ("Unless plain and unambiguous intent to the contrary is manifested, words used in contract language are assigned their ordinary meaning.") When attempting to define the term "fine jewelry," the Court must preliminarily confine its analysis to the four corners of the 1997 Lease, and may only consult extrinsic facts or aids if it is determined that, based on the provisions of the lease, the term "fine jewelry" is in fact ambiguous. See Merrimack Mutual Fire Ins. Co. v. Dufault,958 A.2d 620, 624-25 (R.I. 2008) ("[B]efore the trial justice may look to extrinsic evidence an ambiguity must be found in the terms of the contract."); see also Capital Properties, Inc.v. State, 749 A.2d 1069,1081 (R.I. 1999); Clark-Fitzpatrick, Inc./Franki Foundation Co. v.Gill, 652 A.2d 440, 443 (R.I. 1994) (citing Greenwald v. Selya Innuccillo, Inc., 491 A.2d 988, 989 (R.I. 1985)). Further, in analyzing the 1997 Lease, the term "fine jewelry" may be deemed ambiguous only if "it is reasonably and *Page 13 
clearly susceptible of more than one interpretation." Cathay Cathay,Inc., 962 A.2d at 746 (quoting Rotelli v. Catanzaro, 686 A.2d 91, 94
(R.I. 1996)); see also Riviera v. Gagnon, 847 A.2d 280, 284 (R.I. 2004) (quoting Rubery v. Downing Corp., 760 A.2d 945, 947 (R.I. 2000)). After a careful examination, the Court concludes that the term "fine jewelry," as referred to in paragraphs 7(a) and 44 of the 1997 Lease, is ambiguous.
Pursuant to paragraph 7(a) of the 1997 Lease, it is clear that, for purposes of the instant matter, items such as rings, chains, bracelets, necklaces, earrings, precious stones, and watches are all capable of being classified as articles of "fine jewelry." (Trial Ex. 1, ¶ 7(a).) However, it is axiomatic that while some rings, chains, bracelets, necklaces, earrings, and watches may be considered articles of "fine jewelry," surely not every such item is capable of that distinction. Further, as mentioned previously, nowhere within the four corners of the 1997 Lease do the parties attempt to clarify this apparent paradox by providing a precise definition of the term "fine jewelry." Thus, in an effort to determine the plain and ordinary meaning of the term "fine jewelry," the Court sought guidance from Black's LawDictionary, [8] as well as a number of non-legal dictionaries.[9] The Court's efforts were fruitless, however, for while the words "fine" and "jewelry" are both separately defined in all dictionaries consulted by the Court, [10] nowhere is the term "fine jewelry" specifically defined. *Page 14 
Despite the lack of a uniform definition, as a practical matter, the Court acknowledges that the term "fine jewelry" likely refers to those jewelry items that are of exceptionally high quality and craftsmanship. Nonetheless, such a definition, while somewhat helpful, is certainly susceptible to more than one reasonable interpretation and far too broad and amorphous to be used to determine which particular pieces of jewelry — namely, watches — are considered "fine jewelry" and which are not. Consequently, because of the uncertainty and ambiguity in the 1997 Lease regarding the term "fine jewelry," the Court must refer to extrinsic materials for clarification.
At trial, both the Plaintiff and the Defendants presented testimony regarding the meaning of the term "fine jewelry." For the Plaintiff, Peter D. Pritsker ("Mr. Pritsker"), the President and majority owner of Diamond, and Michael Sammartino ("Mr. Sammartino"), an employee of Diamond, offered a definition that any watch or piece of jewelry with a retail price of $200 and above is considered "fine jewelry." Additionally, the Plaintiff also presented Dr. Elaine Notarantonio ("Dr. Notarantonio") as an expert witness.[11] Among other things, Dr. Notarantonio opined on the definition of "fine jewelry" and testified that determining whether an item is "fine jewelry" is based on a number of factors, such as branding, price-point, and consumer perception.
In response, the Defendants presented two expert witnesses of their own: Darrell S. Ross ("Mr. Ross"), the President and CEO of Ross-Simons Jewelers ("Ross-Simons"), and Arthur DeMello ("Mr. DeMello"), a certified gemologist and jewelry appraiser.[12][13] *Page 15 
Contrary to the views proffered by the Plaintiff's witnesses, during his testimony, Mr. Ross indicated that, while price can be considered a secondary factor, the term "fine jewelry," as opposed to costume or fashion jewelry, refers primarily to items made of precious metals (i.e., gold, silver, platinum, etc.) and gem stones (such as diamonds, rubies, sapphires, etc.).[14] See 11/13/2008 Trial Test. of Darrell S. Ross, 5. In addition to providing his expert opinion on what constitutes "fine jewelry," Mr. Ross also conveyed his thoughts on what types of watches qualify for classification as articles of "fine jewelry." In particular, Mr. Ross testified that most watches, even expensive watches, do not constitute "fine jewelry" unless they are made of precious metals and gemstones.[15] See id. 6, 8, 31-32. Finally, Mr. DeMello — echoing Mr. Ross's testimony — testified that, in his opinion, "fine jewelry" pertains to articles of adornment made from precious metals and precious gemstones.
In light of the conflicting testimony and evidence presented by both the Plaintiff and the Defendants at trial, together with the lack of any formal definition in the 1997 Lease or any dictionary consulted by the Court, it is readily apparent that the elucidation of the term "fine jewelry" is indeed clearly susceptible to more than one reasonable interpretation. Nonetheless, after thoroughly reviewing the evidence and listening to the testimony of all the witnesses, the Court has concluded that, for purposes of the instant matter, it will adopt Mr. Ross's definition of "fine jewelry" and opinion on what *Page 16 
characteristics qualify a watch for such a classification as a guideline.[16] Accordingly, the Court will consider only those watches consisting of precious metals and gemstones capable of classification as articles of "fine jewelry."
 C Primary Purpose
With that, the Court now shifts its focus to the remaining language contained in Diamond's exclusivity provision. As noted previously, in analyzing the language of the exclusivity provision, the Court must first look at the plain and ordinary meaning of the language used.See Irene Realty Corp., 2009 WL 1576517 *4; see also Cathay Cathay,Inc., 962 A.2d at 746; Sturbridge Home Builder, Inc., 890 A.2d at 63;Cerilli, 612 A.2d at 37-38. Paragraph 44 of the 1997 Lease expressly states that, "the Landlord may not lease space within the Center to a store whose "primary purpose is the retail sale of fine jewelry." (Trial Ex. 1, ¶ 44) (emphasis added.). The Court hastens to add that looking solely at the 1997 Lease, the common sense ordinary and usual meaning of "primary purpose" is the main, chief, or principal purpose for which a store conducts business. Further, this view is supported by the formal definition of the term "primary" promulgated by various learned sources.[17] See Black's Law Dictionary at 1190 (6th
ed. 1990) ("[f]irst; principal; chief; leading. First in order of time, development, or *Page 17 
intention"); see e.g., The Merriam-Webster Online Dictionary, 2009 ("of first rank, importance, or value"); The American Heritage Dictionary ofthe English Language, 4th Edition 2000 ("first or highest in rank, quality, or importance; principal"); The Random HouseDictionary of the English Language, 2nd Edition 1987 ("first or highest in rank or importance; chief; principal"). Considering this authority, together with the common sense definition of the term "primary," the Court finds that "primary purpose," as used in paragraph 44 of the 1997 Lease, means the first, chief, and leading purpose of the store — here, PWH — is the retail sale of "fine jewelry."
In arguing that the primary purpose of PWH's store in the Center is the retail sale of fine jewelry, Diamond points to the provisions of the PWH Lease, PWH's actual operations in the Center, as well as Gateway's actions and treatment of PWH during the store's tenancy in the Center. Regarding the PWH Lease, Diamond specifically references section 1.1(h), which requires PWH to use its premises in the Center "Only as a first-class, high-quality retail store principally and primarily for the retail sale of watches and related watch accessories" and devote "[A] minimum of sixty-five percent (65%) of the floor area of the demised premise[s] . . . to retail sales." (Trial Ex. 2, § 1.1(h).) Further, Diamond also cites Exhibit B to the PWH Lease, entitled "Construction," which states in part, "[T]he placement of Tenant's typical jewelry cases for watches/accessories in the front of the demised premises with Tenant's repair service area located in the rear portion of the demised premises."[18] Id., Exhibit B, B-2. Diamond maintains that based on the express terms of the PWH Lease, the primary purpose of the *Page 18 
PWH store in the Center is the retail sale of "fine jewelry" — namely, watches — and not the servicing or repair of watches, which is a secondary purpose.
In addition to the specific provisions of the PWH Lease, Diamond also asserts that PWH's operation of its store in the Center, along with Gateway's actions concerning the store, further confirm that the primary purpose of the PWH location in the Center is the retail sale of fine jewelry. In support of these arguments, at trial, Diamond presented scores of documentary evidence and testimony regarding PWH's inventory, retail sales, advertising, revenue sources, store lay-out, and display area. Diamond also presented documentary evidence of Gateway's actions regarding PWH's store in the Center. In particular, Diamond focused on Gateway's repeated characterization and identification of PWH as a retailer of fine jewelry to both the general public and other tenants of the Center.
The problem with the Plaintiff's arguments, however, is that even if the Court were to find arguendo that the primary purpose of PWH's store in the Center is the retail sale of watches, as opposed to the service and repair of watches, that fact alone does not denote that the primary purpose of PWH's store in the Center is the retail sale of "finejewelry," which is what is specifically required under paragraph 44 of the 1997 Lease for there to be a violation of the exclusive.See Trial Ex. 1, ¶ 44. Pursuant to the expert testimony of Mr. Ross adopted by this Court, for purposes of the instant matter, only those watches consisting of precious metals and gemstones are capable of classification as pieces of "fine jewelry." Thus, in order for the primary purpose of PWH's location in the Center to be considered the retail sale of "fine jewelry," PWH's primary purpose *Page 19 
must not only be the retail sale of watches, but also, in particular, watches that contain precious metals and gemstones.[19]
As mentioned previously, at trial, Diamond proffered numerous pieces of evidence concerning PWH's inventory of watches, watch sales, as well as the specific retail prices at which PWH sells its watches. However, upon careful review, it is apparent to the Court that the record is virtually devoid of any substantive evidence detailing of what types of materials the specific watches carried by PWH consist. Without such evidence, the Court is unable to determine whether the primary purpose of PWH's store in the Center is in fact the retail sale of "fine jewelry" — i.e., watches made of precious metals and gemstones. Further, as the party asserting that Gateway violated the exclusivity provision contained in the 1997 Lease, Diamond has the affirmative burden of proving this assertion by a fair preponderance of the credible evidence.See Ducharme, 292 A.2d at 226 (citing Donnelly, 191 A.2d at 147);Woodward, 181 A.2d at 624; see also Botelho, 970 A.2d at 547 n. 3. It is, then, the Court's conclusion that the Plaintiff has not met its burden of establishing that Gateway violated the exclusivity provision contained in the 1997 Lease by leasing space in the Center to a store, other than Diamond, whose primary purpose is the retail sale of fine jewelry.[20]
 IV Conclusion
After due consideration of all the evidence, together with the arguments advanced by counsel at trial and in their memoranda, the Court finds that Diamond has failed to *Page 20 
prove by a preponderance of the credible evidence presented that Gateway breached the exclusivity provision contained in the 1997 Lease by leasing space in the Center to a store, other than Diamond, whose primary purpose is the retail sale of fine jewelry. As such, Diamond is not entitled to a fifty percent (50%) refund in Fixed Minimum Rent paid from December 2004 through September 30, 2008 — totaling $318,391.80 — nor is Diamond entitled to any costs of suit, including reasonable attorneys' fees.
Prevailing counsel may present an order consistent herewith which shall be settled after due notice to counsel of record.
[1] Specifically, Diamond asserts that the primary purpose of the store opened in the Center by the third-party defendant, Providence Watch Hospital ("PWH"), pursuant to an Indenture of Lease entered into between PWH and Gateway ("PWH Lease"), is the retail sale of fine jewelry.
[2] Paragraph 44 of the 1997 Lease provides that if the landlord violates the exclusive by leasing space in the Center to a store whose "[P]rimary purpose is the retail sale of fine jewelry," then, should the landlord not cure the violation within thirty days following receipt of the tenant's written notice of the violation, the tenant would, in addition to any other remedies at law or in equity, have its Fixed Minimum Rent reduced by fifty percent (50%). (Trial Ex. 1, ¶ 44.) The tenant's fifty percent (50%) reduction in Fixed Minimum Rent would be effective the first day following the expiration of the landlord's thirty day grace period and would remain in effect as long as the violation continued. Id.
[3] Gateway's thirty day grace period in which to cure the violation expired on December 11, 2004.
[4] On Friday, June 26, 2009, pursuant to an Order by this Court in the matter of Levinger v. Providence Watch Hospital, LLC, a Temporary Receiver of PWH was appointed to take charge of its assets, affairs, estate, effects, and property. A subsequent hearing has been scheduled before this Court regarding the appointment of a Permanent Receiver.
[5] For convenience, Gateway and PWH will be periodically jointly referred to as "Defendants." However, it should be noted that, for purposes of trial, Gateway's claim(s) against PWH have been severed and are thus separate from the current adjudication.
[6] In November of 2006, Diamond exercised its option to extend the term of its lease for an additional period of five years, terminating May 31, 2012.
[7] See also Caminetti v. Pacific Mut. Life Ins. Co. ofCalifornia, 139 P.2d 908, 915 (Cal. 1943); Schweigert v. BeneficialStandard Life Insurance Co., 282 P.2d 621, 626 (Or. 1955); Holter v.National Union Fire Ins. Co. of Pittspurgh, Pa., 459 P.2d 61, 64
(Wash.Ct.App. 1969).
[8] The Rhode Island Supreme Court "[H]as used dictionaries, includingBlack's Law Dictionary, to aid in determining the plain and ordinary meaning of a word." Garden City Treatment Center, Inc. v. CoordinatedHealth Partners, Inc., 852 A.2d 535, 542-43 (R.I. 2004); see also Statev. Rhode Island Employment Security Alliance, Local 401, 840 A.2d 1093,1097 (R.I. 2003) (employing Black's Law Dictionary to define "negotiation").
[9] See e.g., The Merriam-Webster Online Dictionary, 2009; American Heritage Dictionary of the English Language, 4th Edition 2000; The Random House Dictionary of the English Language, 2nd Edition 1987.
[10] The term "jewelry" was defined in every dictionary consulted by the Court except the Black's Law Dictionary. See Black's LawDictionary, (8th ed. 2004.)
[11] Dr. Notarantonio is a professor of marketing at Bryant College, as well as an independent marketing researcher and consultant.
[12] Ross-Simons is a large jewelry retailer that sells jewelry, watches, and giftware. (11/13/2008 Trial Test. of Darrell S. Ross, 4.)
[13] For clarification purposes, Mr. DeMello was the expert witness presented by Gateway, and Mr. Ross was the expert witness presented by the third-party defendant, PWH.
[14] While Mr. Ross did indicate that price may be a consideration and that articles of "fine jewelry" could be ornamented with gem stones, he made it clear that the "[C]ore meaning of fine jewelry is the aspect of having precious metals." (11/13/2008 Trial Test. of Darrell S. Ross, 5.) Mr. Ross also maintained that his description of what connotes "fine jewelry" is, to the best of his knowledge, standard within the jewelry industry. Id.
[15] It should be noted that while Mr. Ross did indicate that some watches containing precious metals and gemstones could be considered "fine jewelry," he also testified that the subset of watches fitting that criteria is extremely small and that as a general rule, he considers watches to be a separate and distinct category from jewelry. (11/13/2008 Trial Test. of Darrell S. Ross, 5-6, 8, 27, 31-32.)
[16] The Court candidly thanks Dr. Notarantonio, Mr. Pritsker, Mr. Sammartino, and Mr. DeMello for their lucid testimony. However, considering his extensive hands on experience in the jewelry industry, including twenty-six years as President and CEO of Ross-Simons, the Court, as is within its power to do, found more credible the expert testimony of Mr. Ross and chooses to adopt his definition of "fine jewelry," and in particular, which types of watches can be classified as such. See Conti v. Rhode Island Economic Development Corp.,900 A.2d 1221, 1238 (R.I. 2006) (when sitting as finder of fact, "A trial justice retains the authority to determine the credibility of each expert's evidence. . . ."); see also McEntee v. Davis, 861 A.2d 459, 464 (R.I. 2004) (in non-jury trials, the task of "determining the credibility of witnesses is peculiarly the function of the trial justice");Sun-Lite Partnership v. Town of West Warwick, 838 A.2d 45, 48 (R.I. 2003) ("It is well within the discretion of the trial justice to accept the opinion of one expert, while rejecting the opinion of another expert."); see also Walton, 433 A.2d at 964; Hood, 478 A.2d at 184;Rodriques v. Santos, 466 A.2d 306, 312 (R.I. 1983) (question of who is to be believed is one for trier of fact).
[17] See supra, note 8.
[18] Additionally, Diamond also referenced a number of related documents and correspondence pre-dating the actual PWH Lease to support the assertion that the primary purpose of PWH's store in the Center is the retail sale of fine jewelry.
[19] It should be noted that all parties essentially agree that the only items sold by PWH that could possibly be considered articles of "fine jewelry," under any definition of the term, are watches.
[20] Because the Court finds that Diamond has not proven by a preponderance of the credible evidence that Gateway leased space in the Center to a store, other than Diamond, whose primary purpose is the retail sale of fine jewelry, it is unnecessary at this time to address the "incidental sale" language contained in paragraph 44 of the 1997 Lease.